## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | | |
|---|---|---|
| FTI CONSULTING, INC., a Maryland corporation, and FTI LLC, a Maryland limited liability corporation, | ) ) ) ) ) | CIVIL ACTION NO. _____ |
| Plaintiffs, | ) ) ) | |
| v. | ) ) | |
| SECRETARIAT ADVISORS, LLC, a Delaware limited liability company, | ) ) ) ) | |
| Defendant. | ) ) | |

---

## COMPLAINT FOR INJUNCTIVE RELIEF AND DAMAGES

Plaintiffs FTI Consulting, Inc. and FTI, LLC (collectively, "FTI," "Plaintiff" or the "Company") file this complaint for permanent injunctive relief and damages arising from Defendant Secretariat Advisors, LLC's ("Secretariat") ongoing tortious interference with FTI employment and client contracts, misappropriation of FTI confidential information and trade secrets, inducement of contractual and fiduciary duty breaches by current and former FTI senior professionals, civil conspiracy, and unjust enrichment (the "Complaint"). In support of its Complaint, FTI shows this Court the following:

## NATURE OF ACTION

1.     FTI and Secretariat are competing consulting firms that offer testifying and consulting expert services – among other things – in a variety of sectors including construction, forensic accounting, investigations and other court and arbitration disputes.  This action arises from Secretariat's pervasive and unlawful scheme to raid FTI professional staff – around the nation and abroad – by inducing them to breach their contractual and fiduciary duties to FTI and misappropriate FTI trade secrets and other confidential information.  Powered by new sources of private equity, Secretariat's business plan is to quickly inflate its headcount by gobbling up professionals in competing practice groups and then "flip" the company in a future public offering or other transaction.  But instead of negotiating or competing fairly for what its private equity backers want, Secretariat is embarked on a piratical and unlawful raid to grab whatever they can.  Secretariat's modus operandi is to induce FTI professionals in targeted practice areas to breach their non-compete obligations by signing on with Secretariat in directly-competing roles.  Before and after onboarding the targeted FTI professionals, Secretariat directs them not to cooperate with FTI about their departures, all the while pumping them to divulge FTI confidential information and trade secrets about current client matters and other key personnel at FTI.  Fueled by misappropriated FTI confidential information and trade secrets, breached employment contracts, and stolen clients, Secretariat and its

newly-converted FTI professionals then repeat the cycle by interfering with still other FTI employment and client contracts.  Over the past few months, FTI has repeatedly warned Secretariat to desist from its unlawful course, negotiate in good faith, and stop interfering with FTI's employment and client contracts.  But Secretariat recognizes no law constraining its conduct.

## PARTIES

2.     Plaintiff FTI Consulting, Inc. is a corporation organized and existing under the laws of the State of Maryland with its principal place of business at 16701 Melford Boulevard, Suite 200, Bowie, Maryland 20715. FTI Consulting is therefore a citizen of the State of Maryland.

3.     Plaintiff FTI, LLC is a limited liability company organized and existing under the laws of the State of Maryland and a wholly-owned subsidiary of FTI Consulting, Inc., and is therefore also a citizen of the State of Maryland.

4.     Defendant Secretariat is a limited liability company organized under the laws of Delaware with its principal place of business located within this judicial district at 1175 Peachtree Street N.E., 100 Colony Square, Suite 400, Atlanta, Georgia 30361.  The Secretariat conduct alleged herein was directed from its Atlanta headquarters and aimed at injuring FTI in Maryland and elsewhere.

## NON-PARTIES

5.      Several former FTI professionals, not named as defendants herein, have been induced by Secretariat to breach their contracts, fiduciary duties and duties of loyalty with and to FTI and to share FTI's confidential and trade secret information with Secretariat, including:

(a) Christopher Larkin, a resident of Ontario, Canada.  Mr. Larkin was a Senior Managing Director within FTI's construction group for several years, and was also Leader of the Americas for FTI's construction practice and in charge of FTI's Toronto office until April/May 2023, after Secretariat induced him to join Secretariat in a directly-competing position as Managing Director in its newly-established Toronto office.

(b) Robert Poole, a resident of Ontario, Canada.  Mr. Poole was a Senior Managing Director within FTI's construction practice group for several years until July 2023, after Secretariat induced him to take a directly-competing senior management position within its construction group in Canada.

(c) Nelson Gallardo, a resident of the State of Georgia.  Mr. Gallardo was a Senior Managing Director within FTI's construction group for many years in its Atlanta office, until October 2023, after Secretariat induced him to

take a directly-competing senior management position within its own construction group in Atlanta.

(d) Dan Clark, a resident of the State of Washington. Mr. Clark was a Senior Managing Director within FTI's construction group for several years in its Houston office until October 2023, after Secretariat induced him to take a directly-competing senior management position within its own construction group.

(e) David Todd, a resident of the State of Texas. Mr. Todd was a Senior Director within FTI's construction group in Texas for several years until October 2023, after Secretariat induced him to take a directly-competing senior management position within its own construction group in Texas.

(f) Qianwei Mao, a resident of the State of Georgia. Ms. Mao was a Senior Director within FTI's construction group in Georgia for several years until October 2023, after Secretariat induced her to take a position as Associate Director within its own construction group in Atlanta.

(g) Adolfo Menendez, a resident of the State of Georgia. Mr. Menendez was a Senior Director within FTI's construction group in Atlanta for several years until October 2023, after Secretariat induced him to take a position as Associate Director within Secretariat's construction group in Atlanta.

(h) Gary Kleinrichert, a resident of the State of Indiana.  Mr. Kleinrichert was a Senior Managing Director based in Chicago, Illinois for several years until December 24, 2023, after Secretariat induced him to take a directly-competing position as a Managing Director in its own forensic accounting and advisory practice in Chicago.  Immediately prior to his departure, Mr. Kleinrichert led the North America Risk & Investigations practice at FTI.

(i) Carrie Distler, a resident of the State of Illinois.  Ms. Distler was a Senior Managing Director within FTI's forensic accounting and advisory group in Chicago, Illinois for several years until December 24, 2023, after Secretariat induced her to take a directly-competing position as a Managing Director in its own forensic accounting and advisory practice in Chicago.

(j) Edward Westerman, a resident of the State of Wyoming.  Mr. Westerman was a Senior Managing Director and the Leader of Global Investigations within FTI's forensic & litigation practice group for many years until February 29, 2024, after he notified FTI that he was leaving to take a directly-competing position at Secretariat.

Because Secretariat's unlawful conduct is ongoing, facts and claims about additional FTI professionals who breach their contracts with FTI may become relevant as this litigation moves forward.

## JURISDICTION

6.     This Court has personal jurisdiction over Defendant Secretariat because it is registered to do business in the State of Georgia, has registered offices and agents in Georgia, is headquartered in Georgia, and transacts business in Georgia.

7.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. §1331, as FTI asserts claims against Secretariat under the federal Defend Trade Secrets Act, 18 U.S.C § 1836, *et seq.*  Plaintiffs' state law claims arise from the same case or controversy as its federal claim, and this Court therefore has supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367.  The Court also has original subject matter jurisdiction over the Plaintiffs' state law claims under 28 U.S.C. § 1332(a) as set forth in the following paragraph.

8.     The Court has original subject matter jurisdiction over this matter under 28 U.S.C. § 1332(a) because the amount in controversy – excluding interest and costs and including compensatory damages and the value of injunctive relief sought – exceeds $75,000 and, upon information and belief, there is complete diversity between the parties.  FTI has conducted a reasonable inquiry to determine the LLC membership of Secretariat, which is a Delaware LLC, and found no information indicating any connection between Secretariat or its members and the State of

Maryland, FTI's state of citizenship.  Upon information and belief, no member of Secretariat is a Maryland citizen, and all of its members are citizens of other states.

## VENUE

9.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(1) and (2), because this is the judicial district in which a substantial part of Defendant's challenged conduct took place giving rise to the claims asserted, given that Secretariat is headquartered in Atlanta, and this is also the judicial district in which Secretariat is subject to this Court's personal jurisdiction.

## FACTS

**A.     FTI and Secretariat are Competing Consulting and Forensic Services Firms.**

10.     FTI is a global business advisory firm founded in 1982, headquartered in Washington, D.C., with offices across the United States and abroad.  FTI provides a diverse range of consulting and forensic services to assist its clients in a variety of key segments including construction, forensic accounting, investigations and other litigation services.

11.     FTI's construction group provides commercial management, risk-based advisory consulting, dispute resolution services, testifying and consulting expert, and other strategic consulting services on a range of complex commercial real estate, asset life management, construction projects, and related court or arbitration disputes.

12.     FTI's disputes, forensic accounting and fraud investigations practice groups advise clients and provide testifying and consulting experts to address economic damages assessments, accounting improprieties, conflicts of interest, misappropriation of assets, circumvention of regulations, and a host of other legal and regulatory compliance issues and disputes.

13.     FTI invests heavily in, and relies primarily upon, highly-trained and skilled professionals to develop and maintain strong relationships with clients while delivering high quality consulting and testifying expert services, often under demanding court deadlines and other strategic and logistical pressures.

14.     Forbes and trade publishers consistently rank FTI as a "Best Employer" and "Best Places to Work" in recent years, and the FTI practice groups at issue have also received many accolades and industry awards.

15.     Secretariat is also a business advisory firm, headquartered in Atlanta, Georgia and with other offices in the U.S. and abroad.  Secretariat competes directly with FTI, and maintains or is attempting to open offices in many of the same North American cities as FTI, including Atlanta, Boston, Chicago, Dallas, Denver, Houston, Los Angeles, New York, Philadelphia, San Diego, San Francisco, Seattle, Toronto, and the District of Columbia.

**B.**    **Messrs. Kleinrichert, Gallardo, Larkin, Poole, Westerman, and Ms. Distler Were Senior Managing Directors at FTI Bound by Enhanced Employment Contracts with Fiduciary Duties and Duties of Loyalty.**

16.    In May 2002, FTI hired Mr. Kleinrichert as a managing director practicing in its forensic accounting and investigations group in its Chicago, Illinois office.  FTI elevated Mr. Kleinrichert to Senior Managing Director status in 2007.

17.    In March 2008, FTI hired Mr. Larkin into its construction group in its Dubai office.  Four years later in April 2012, FTI promoted Mr. Larkin to Senior Managing Director.  In 2015, FTI entered into a new Senior Managing Director employment agreement with Mr. Larkin when he relocated to take charge of FTI's office in Toronto while acting as FTI's Leader for the Americas in that practice group.

18.    In May 2010, FTI hired Mr. Gallardo into its construction solutions group as a Senior Consultant.  Over the course of his 13-year tenure at FTI, Mr. Gallardo advanced within the Company and ultimately achieved the position of Senior Managing Director.

19.    On December 13, 2020, Mr. Poole entered into a Senior Managing Director employment agreement with FTI, under which he practiced in FTI's construction group in Toronto.

20.    In March 2011, FTI hired Mr. Westerman as a Senior Managing Director, and he soon achieved the position of Leader - Global Investigations.

21.     In February 2004, FTI hired Carrie Distler as a Senior Managing Director providing forensic evaluation and litigation services in FTI's Chicago office.

22.     Upon hiring or during the course of their respective employment at the Company, FTI awarded Messrs. Kleinrichert, Larkin, Gallardo, Westerman, and Ms. Distler an enhanced Key Senior Managing Director Incentive Plan ("KSIP") employment contract with retention incentives including special cash awards, higher base salary, forgivable loans, and restricted stock awards made available only to key leadership personnel within the company.  FTI awards KSIP contracts to a select few senior managing directors who achieve leadership status at the very top of their FTI practice groups.  An exemplar of FTI's KSIP Employment Agreement is attached hereto as Exhibit "A."  The restrictive covenants set forth in Exhibit "A" are substantially similar for each of Messrs. Kleinrichert, Gallardo, Larkin, Poole, Westerman, and Ms. Distler.

23.     In their Employment Agreements, each of the aforementioned Senior Managing Directors agreed to certain restrictive covenants.  They agreed that, as a result of their leadership position with FTI, they would have access to – indeed, frequently generated on the Company's behalf – FTI's confidential information, trade secrets, valuable client relationships, and company goodwill.

24.     In their Employment Agreements, each of the foregoing professionals agreed that the substantial consideration received under their Employment Agreements "serves as sufficient consideration" for their promises to abide by FTI's restrictive covenants, that "such restrictions are reasonable," and that the rights and obligations set forth in their contracts' restrictive covenants "will survive termination of this Agreement and of [their] employment with the Company." *See e.g.,* Exhibit "A" at § 11 (Restrictive Covenants).

25.     In Section 12 of their Employment Agreements, each of the aforementioned FTI professionals agreed that:

> during the Restricted Period (defined below), Employee will not, directly or indirectly, be employed by (in a similar capacity and rendering similar services as when Employee was employed by the Company), lend money to, invest in, or engage in a Competing Business (defined below) in any Market Area (defined below).

That section also provides that following termination of their employment at FTI, the Senior Managing Directors "may provide services as an officer, consultant, employee, director, partner or otherwise to an entity engaged in multiple business lines (including a business line that is a Competing Business) provided that the business line(s) for which Employee provides services is not a Competing Business." *Id*. at § 12.

26.     In Section 13 of their Employment Agreements, each of the foregoing professionals agreed that during a defined Restricted Period following their

departures from FTI, they would not "directly or indirectly" and "whether for Employee or for any other individual or entity" other than FTI:

> (a) solicit business regarding any case or matter upon which Employee worked on behalf of the Company during the term of this Agreement;
>
> (b) solicit business from any person or entity who is a client of the Company's business in which Employee was engaged at the time of or at any time within a twenty-four (24) month period of time immediately prior to the termination of Employee's employment with the Company;
>
> (c) solicit, induce or otherwise attempt to influence any person who the Company employs or otherwise engages to perform services including, but not limited to, any employees, independent contractors, engineers, or sales representatives, or any contractor, subcontractor, supplier, or vendor of the Company, to leave the employ of or discontinue providing services to the Company, provided however that this restriction will not apply in the case of any clerical employee of the Company or in the case of any other employee whose employment with the Company has been terminated for at least one (1) year . . .."

27.     In FTI's Employment Agreement, each of the foregoing professionals agreed that their leadership positions at FTI gave them ongoing "access to Confidential Information (defined below) not generally known outside of the Company that may be of value to the Company or that has been given to the Company in confidence by third parties."  They agreed that they will not at any time:

> "use, disclose, or publish any Confidential Information that Employee may learn or become aware of, or may have learned or become aware of because of Employee' association with the Company, or use such

information in a manner that is or may reasonably be likely to be detrimental to the business of the Company."

"Confidential Information" is defined to include several specific items including, among other things, personnel matters, financial information, trade secrets, FTI customer lists, business plans, processes, models, methods, and opportunities or strategies, as well as Company procedures, manuals, legal matters, and any other proprietary information not generally known outside the Company. *See e.g.*, Exhibit "A" at § 14. And under Section 15 of their contracts with FTI, each of the foregoing professionals committed to deliver to FTI all confidential information in their possession upon termination from the Company, and promised that they "will not, without the Company's consent, retain copies, excerpts, summaries, or compilations of the foregoing information and materials." *Id*. at § 15.

28.   FTI's KSIP Employment Agreements typically provide agreed-upon remedies in the event a Senior Managing Director breaches his or her non-competition or non-solicitation covenants. Many of the FTI Senior Managing Directors at issue in this Complaint agreed that "harm to the Company would result by  breach of Sections 12 [non-competition] and 13 [non-solicitation] of this Agreement by Employee and the resultant injury is difficult to estimate accurately and that actual damages cannot be easily ascertained. As a result, the parties agree that as remedy in the event of a breach of Sections 12 and 13 . . . Employee agrees to pay to the Company the following sum certain:

14

(a) For Employee's breach of Section 12, a certain sum equaling Employee's prior 12 months total earned compensation (including salary, bonus, and incentive compensation but excluding Benefit Plans) from the Company;

(b) For Employee's breach of Section 13(a), (b), or (d), a certain sum equaling 25% of the total revenue earned by the Employee and/or any entity or person that may employee the Employee from the client or clients who were solicited or contacted by Employee during the [Restricted Period];

(c) For Employee's breach of Section 13(c), a certain sum equaling the prior 12 months total earned compensation (including salary, bonus, and incentive compensation but excluding Benefit Plans) from the Company of the employees who were solicited by Employee."

*See e.g.,* Exhibit "A" at §19.

29.    In the KSIP Employment Agreements providing for sum certain recoveries for breaches of non-competition and non-solicitation covenants, FTI Senior Managing Directors "acknowledge[d] that the certain sums contained herein are a reasonable forecast of the just and fair compensation for the harm to the Company that would result by Employee's breach, and is not a penalty."  Under that same section, they also agreed that in the event of breach, among other remedies, the "Company will be entitled to obtain a temporary restraining order and/or a preliminary or permanent injunction restraining Employee from engaging in prohibited activities," and that no bond or other security must be required for such an injunction.  *Id.*

30.    FTI's  Employment Agreements at issue define a "Restricted Period" that extends twelve (12) months after termination "for any reason." *See e.g.*, Exhibit "A" at §17.

31.    FTI's Employment Agreements at issue define "Competing Business" as "any line of business in which Employee was substantially engaged or about which Employee gained substantial Confidential Information during Employee's employment with the Company, that is conducted by the Company during the period of Employee's employment with the Company and at the time Employee's employment ends." *See e.g.*, Exhibit "A" at §17(b).

32.    FTI's Employment Agreements at issue define "Market Area" as meaning any place "where the Company conducts business and in which Employee (i) provided products for the Company; (ii) performed services for the Company; or (iii) where the Company's clients for which Employee provided products or services are located." Exhibit "A" at §17(c).  Under that contractual provision, each of the Senior Managing Directors agreed that "due to the nature of the business conducted by the Company, this geographic scope is reasonable and necessary to protect the Company's legitimate protective interests." *Id*.

33.    Each of the U.S.-based FTI Senior Managing Directors at issue in this Complaint agreed that their contracts must be governed by Maryland law, without regard to conflicts of law provisions. *See e.g.* Exhibit "A" at §24.

16

34.     In the ordinary course of their leadership and fiduciary duties as leaders of FTI practice groups, each of the foregoing FTI Senior Managing Directors served as agents for FTI and had significant responsibilities for the oversight of FTI's business operations including the following: (a) they regularly formulated business strategy for the Company; (b) they regularly solicited customers and new hires of professional and administrative personnel for FTI; and (c) they engaged in the pursuit of sales and contracts for FTI services and negotiated and signed client contracts on behalf of FTI.

35.     In the course of their duties at FTI, the foregoing Senior Managing Directors were responsible for hiring, firing, and managing other professionals within their respective FTI practice groups, and they supervised the work of other FTI employees.  Indeed, on some occasions, they assisted FTI in the successful enforcement of FTI's restrictive covenants against other departing senior professionals.

36.     FTI would not have entrusted these Senior Managing Directors with access to its confidential information and trade secrets or entrusted them with FTI's goodwill and the leadership of FTI practice groups if they had not agreed to be bound by the restrictive covenants and nondisclosure agreements set forth in each of their KSIP Employment Agreements.

37.     Each of these Senior Managing Director's execution of their respective Employment Agreement's non-disclosure, non-competition, and non-solicitation covenants provided FTI vital assurances about the security of its significant investments in these key senior managers.  In turn, these promises protected FTI's goodwill (including any customer or employee goodwill these Senior Managing Directors were building for FTI through their leadership positions at the Company), trade secrets, and other confidential information entrusted to these professionals.  In reliance on their contractual assurances and fiduciary duties, FTI routinely provided each of the foregoing Senior Managing Directors with confidential information and trade secrets as defined in their KSIP Employment Agreements and under the law.

38.     In consideration and exchange for the restrictive covenants in their employment contracts with FTI, each of these Senior Managing Directors were highly-compensated in the form of substantial six-figure or seven-figure annual base salaries, as well as six-figure annual performance bonuses and retention loans and grants ranging from six-to seven-figures.  Also in exchange for the restrictive covenants, FTI heavily promoted the Senior Managing Directors throughout the industry to support their visibility and efforts to build FTI's practices.

39.     FTI fully performed the obligations it owed to each of the foregoing Senior Managing Directors under their respective Employment Agreements, and

provided each of them with all agreed-upon enhanced compensation and other highly-valuable benefits pursuant to their Employment Agreements.

**C.      Messrs. Clark, Todd, Menendez, Ms. Mao and Other Former FTI Professionals Are Also Bound by Contractual Restrictive Covenants and Fiduciary Duties and Duties of Loyalty Owed to FTI.**

40.      In addition to the foregoing FTI key Senior Managing Directors, there are other FTI professionals whom Secretariat targeted and induced into breaching their employment contracts with, and fiduciary and loyalty duties owed to, FTI. Among these are Mr. Clark, Mr. Todd, Ms. Mao, and Mr. Menendez.  Each of these individuals were employed by FTI at the director-level or above, and each of them earned substantial six-figure salaries while at FTI.  Each of these FTI professionals were obligated not to directly or indirectly: (a) disclose FTI confidential information to Secretariat or any other third party; (b) solicit FTI employees to leave Company; and (c) solicit FTI clients to stop doing business with the Company.  Some of them also remain subject to 12-month non-compete covenants similar to those applicable to the key Senior Managing Directors identified in the preceding paragraphs.

41.      In the ordinary course of their duties within FTI's practice groups, each of the foregoing professionals served as agents for FTI and had significant responsibilities and oversight of FTI's business operations.  Among other things, they regularly solicited customers for FTI, had authority to enter into and negotiate certain contracts on behalf of FTI, and performed the resulting contracts for FTI

services.  They participated in strategic planning for their practice groups, and represented FTI within the market at industry conferences, local events, and in thought leadership development.  FTI also highly compensated these professionals.

**D.    Secretariat's Campaign to Induce the Former FTI Professionals to Breach Contracts and Fiduciary and Loyalty Obligations to FTI.**

42.    Early in 2023, Secretariat managers in Atlanta began inducing FTI construction group professionals in Atlanta, Houston, Toronto, Seattle, and other cities to breach their contractual and fiduciary duties to FTI.  Secretariat's initial target was Mr. Larkin, head of FTI's Toronto office, whom Secretariat pursued as the first step in its plans for a new Canadian office.  At some unknown point early in 2023, Secretariat and Mr. Larkin agreed that he would join Secretariat's competing construction advisory practice in violation of the restrictive covenants in his FTI employment agreement.  In March 2023, Mr. Larkin gave notice to FTI of his intent to resign.  Thereafter, but while still employed at FTI, Mr. Larkin breached his fiduciary duties by holding himself publicly as if he were already employed with Secretariat.  In breach of his fiduciary and contractual duties not to solicit FTI clients or employees, prior to leaving FTI, Larkin also began encouraging FTI clients and other FTI professionals to join him at Secretariat.  Mr. Larkin took these actions at the behest, direction, approval, urging, and/or knowledge of Secretariat.

43.    On or about April 24, 2023, Mr. Larkin began working as Managing Director in Secretariat's new Toronto office, providing consulting services to

construction industry clients in direct competition with FTI. Within a month, Mr. Poole – another FTI construction industry professional in the Toronto office – gave notice that he was leaving FTI. Mr. Poole informed FTI that he was aware of his restrictive covenants and had no intention of violating them. But on or about July 3, 2023, he joined Mr. Larkin at Secretariat's new Toronto office, servicing FTI construction clients in direct competition with FTI. When FTI demanded that Secretariat cease and desist from its unlawful conduct, Secretariat lawyers insisted that these professionals owed no contractual or other lawful duties to FTI.

44.    After recruiting Messrs. Larkin and Poole, Secretariat began the next phase of its scheme by raiding other FTI construction group professionals, diverting FTI clients and potential FTI professional recruits, and improperly using FTI's confidential information and trade secrets, including but not limited to personnel information. Throughout the summer and fall of 2023 and continuing up to the present, Secretariat targeted several other FTI professionals – in Atlanta, Houston, Wyoming, Chicago, Seattle, New York, and Bogota, Columbia – inducing or attempting to induce them into abandoning their fiduciary and contractual duties to FTI by joining Secretariat and bringing with them as many FTI clients and fellow employees as they could carry. Both before and after onboarding these new hires, Secretariat pumped them for FTI trade secrets and confidential information about key FTI personnel and clients. In many instances, FTI tried to subcontract with these

professionals to avoid disrupting ongoing services to FTI clients, and avoid or mitigate the conflicted professionals' employment agreement breaches. But taking their directions from Secretariat – often while still employed at FTI – these professionals rejected FTI's subcontracts out of hand and refused to negotiate.

45.     In August 2023, Mr. Clark gave notice that he was leaving FTI's Texas office, without identifying Secretariat's competing construction practice in Texas as his destination. In October 2023, Mr. Gallardo resigned from FTI's Atlanta office to join Secretariat's competing construction practice group in Atlanta. Mr. Gallardo's resignation was soon followed by Mr. Todd giving notice that he was leaving FTI's Houston office, bound for Secretariat's competing construction practice group. Also that same month, Mr. Menendez turned in his resignation at FTI's Atlanta office, and headed over to Secretariat's competing construction group in Atlanta. And Ms. Mao gave notice that she was leaving FTI's Atlanta office, later advising FTI that she was taking a position at Secretariat's competing construction advisory group in Atlanta.

46.     Shortly after Ms. Mao joined Secretariat in early November 2023, FTI learned from its Bogota, Columbia office that Ms. Mao was scheduled to visit there for the purpose of soliciting FTI professionals to join her at Secretariat. FTI warned Secretariat that Ms. Mao's visit violated non-solicitation covenants in her employment contract with FTI.

47.     Secretariat's scheme soon spilled over into FTI's highly regarded disputes and forensic accounting and investigations practice groups – areas in which Secretariat had virtually no prior presence.  In November 2023, two senior managing directors in FTI's accounting and investigation practice in Chicago – Ms. Distler and Mr. Kleinrichert – advised the Company that they would resign at year-end to take positions elsewhere, but they had been instructed by Secretariat *not* to disclose their new employer's identity.  Within a few weeks, Ms. Distler relented and told FTI that Secretariat was her destination. Ms. Distler told FTI management that Secretariat told her not to enter any subcontracts with FTI about servicing FTI clients after her departure.  For his part, Mr. Kleinrichert kept mum and refused to identify his new employer, even while he continued servicing FTI clients and drawing an FTI paycheck.

48.     At Ms. Distler's apparent insistence before she would join their ranks, Secretariat reluctantly negotiated with FTI to buy out her contractual non-compete and client non-solicitation covenants.  The parties finalized an agreement whereby Secretariat agreed to pay a lump sum for FTI's limited waiver and release of Ms. Distler's non-compete and non-solicitation of client covenants.   This limited agreement, however, preserved and did not waive or release her ongoing duties not to solicit FTI employees, nor to misappropriate FTI confidential information or trade secrets, including information about other FTI professionals.  A similar arrangement

was negotiated for Secretariat to buy out some, but not all, of Mr. Kleinrichert's restrictive covenants.

49.     The ink was hardly dry on these arrangements when Secretariat began immediately making firm offers of employment to key colleagues from Ms. Distler's and Mr. Kleinrichert's former FTI teams.  Without any prior interviews or dialogue whatsoever with these additional FTI professionals, Secretariat made specific, firm employment offers to them at compensation levels higher than they received at FTI. Secretariat's "cold-call" firm offers demonstrate inside knowledge about FTI trade secret and confidential personnel matters, including compensation and performance metrics at FTI – information that they could only have learned from Ms. Distler and Mr. Kleinrichert.   Secretariat could not have derived this information from any public source.

50.     In mid-January 2024, Mr. Westerman announced that he was leaving FTI for Secretariat's competing disputes and forensic accounting and investigations practice.  Mr. Westerman's last day at FTI was February 29, 2024.  Before he left FTI, Mr. Westerman solicited and arranged for many of the FTI clients he serviced to leave FTI and switch some or all of their business to Secretariat.  Within days of his departure, FTI learned that Mr. Westerman scheduled a March 2024 visit to FTI's London office with Secretariat's founder Don Harvey for the purpose of soliciting professionals in that office to join Secretariat.  FTI warned Mr. Westerman that his

conduct and planned recruiting visit to FTI's London office violates his FTI employment agreement's surviving non-solicitation covenant. As of this filing, it is unknown whether Mr. Westerman and Secretariat have or will desist from these unlawful solicitations.

51.    The foregoing acts were taken in furtherance of a conspiracy by and among Secretariat, its private equity backers, and some or all of the conflicted FTI professionals it lured away from FTI, as well as other former FTI professionals not identified in this Complaint. The conspiracy's purpose is to: (a) injure FTI in Maryland and hamper the competitive effectiveness of its practice groups; (b) induce breaches of contract and fiduciary duties and duties of loyalty by conflicted professionals who remain in FTI's employ after accepting competing employment at Secretariat; (c) misappropriate FTI trade secrets and confidential information, current and prospective employees, and current and prospective business clients; (d) prevent FTI from timely exercising its employment contract and other rights; and (e) prevent FTI from taking practical steps to mitigate disruption to FTI clients and the potential loss of business and other professional employees put at risk by Secretariat's and recruited FTI professionals' unlawful scheme and conduct. With Secretariat's assistance, encouragement, and approval and on its behalf, the recruited conflicted FTI professionals and other former FTI professionals have solicited FTI clients to follow them to Secretariat – both before and after their departures from

FTI – and provided Secretariat with FTI trade secrets and confidential personnel information used to target still other FTI professionals, prospective hires, and current and prospective business clients. Every FTI professional contacted by Secretariat has been encouraged or induced to breach their fiduciary and contractual obligations to FTI.

52. For months prior to filing this action, FTI sent cease and desist letters to Secretariat and the departing FTI professionals infected with conflicts of interest by Secretariat's unlawful conduct. Neither Secretariat nor the FTI professionals at issue made a good faith attempt to resolve the issues presented, and in most instances Secretariat directed the departing professionals not to deal or negotiate with FTI.

**E. FTI's Restrictive Covenants are Justified by Legitimate Business and Fiduciary Interests Threatened by the Challenged Conduct.**

53. Legitimate business interests justify the restrictive covenants with which Secretariate has tortiously interfered. FTI offers professional consulting, analysis, and forensic services to corporate, non-profit, and governmental clients around the world. FTI competes – with Secretariat and other well-known advisory and consultant firms – in a marketplace for high-value and long-term personal service contracts where the principal stock in trade is the quality of professional people leading and supporting FTI's practice group in a given field of expertise.

54. FTI makes substantial investments to develop Senior Managing Directors and other leading professionals to establish a strong brand and goodwill

providing personal services in a variety of fields – including construction, forensic accounting, investigations and other litigation support services.

55.     FTI Senior Managing Directors have broad access to the Company's trade secrets and other confidential information including personnel matters, financial, strategic, operational, billing models, and human resources plans and data. As reflected in the FTI Employment Agreements at issue, the unique and personal leadership roles that FTI entrusted to the former FTI professionals are not readily replaced without investing further substantial resources of time and money in recruiting, incentivizing, developing, and marketing new professionals.

56.     The roles of Managing Director and Director also constitute significant management positions within FTI's practice groups.  Individuals with these titles are highly-compensated, enjoy access to FTI trade secrets and confidential information, and play vital roles in soliciting and maintaining client relationships for FTI.  FTI invests substantial time, money, and effort training Managing Directors and Director-level management to acquire and hone their skills and help them build FTI's practices.

57.     Based on the foregoing, each of the FTI professionals at issue had regular access to and possesses intimate knowledge about FTI trade secrets and confidential information, including but not limited to: (a) professional staff comparative merits, skillsets, compensation and other non-public personnel matters;

(b) pricing and bidding strategies; (c) confidential business or professional information that otherwise does not qualify as trade secrets; (d) lists and data and other metrics arising from relationships with prospective or existing FTI customers and the financial and other business terms on which FTI has dealt and is dealing with specific customers and clients; and (e) customer and client goodwill associated with FTI's ongoing business and professional practice.

58.    FTI's restrictive covenants are also justified by a legitimate business interest in preserving the talent and goodwill of its senior professionals, on whom FTI relies to pursue business opportunities and ultimately fulfill and deliver the essential services FTI offers to its clients.  Enforcement of the covenants at issue serve to safeguard the practices of current professionals, allowing them to invest in the development of FTI practice groups, and also ensure that they are not improperly influenced – directly or indirectly – to leave FTI by other recently-departed employees.

59.    Each of the conflicted FTI professionals at issue in this Complaint owed fiduciary duties and duties of loyalty to FTI, including the duty to: (a) act primarily for the benefit of FTI in the course of their employment duties and activities; (b) act with candor toward FTI and disclose all material facts related to and arising from the course of their employment at FTI; (c) not to appropriate FTI confidential information; (d) not to solicit FTI clients during or for one year after their

employment at FTI; (e) not to solicit – directly or indirectly – the hiring away of other FTI professionals; (f) not to induce other FTI employees to breach their fiduciary and contractual duties to FTI; (g) not to compete with FTI, nor usurp or divert corporate opportunities away from FTI, while employed at FTI or, in some instances, for one year following termination of employment; (h) not to engage in self-dealing or dealing for the benefit of any FTI competitor; (i) act with integrity, rigorous honesty, and the duty of fair and honest dealing; (j) fully disclose any and all conflicts of interest in matters under negotiation by or for FTI; (k) use uncorrupted business judgment for the sole benefit of FTI; and (l) comply with directives from FTI commensurate with his/her position and job responsibilities at the company.

## COUNT I
## TORTIOUS INTERFERENCE WITH CONTRACT
## AND PROSPECTIVE ECONOMIC ADVANTAGE

60.    The facts and allegations of the preceding paragraphs are re-alleged and adopted by reference herein.

61.    Each of the conflicted FTI professionals identified above were and/or remain subject to enforceable contractual obligations to FTI, including: (a) non-competition and non-solicitation covenants, (b) confidentiality obligations, (c) duties of loyalty, and (d) duties to provide effective notice to FTI of their intent to terminate, all as set forth in their employment agreements with FTI.  These covenants

and obligations are supported by sufficient consideration, including (but not limited to) the professional's employment by FTI, FTI's investment and support building a practice for the professional's benefit while at FTI, and the substantial compensation FTI paid each of the professionals at issue.  In addition, Messrs. Gallardo, Larkin, Poole, Westerman and Kleinrichert expressly agreed pursuant to their employment agreements that they would "work full-time and devote all of Employee's business time, attention, and energies to, on behalf of, and for the benefit of the Company" and that they would not "engage in any activity which conflicts or interferes with the performance of Employee's duties and responsibilities hereunder"  They further agreed that "[i]f an outside activity subsequently creates a conflict with the Company's business or prospective business, Employee agrees to cease engaging in such activity at such time" *See, i.e*., Ex. A, Par. 3

62.    Unless expressly released by FTI, each FTI professional at issue was and remains subject to contractual non-disclosure, non-solicitation and/or non-competition restrictive covenants in the manner alleged above.

63.    At all times relevant, Secretariat was fully aware of the existence of the FTI professionals' employment contracts and their terms, including their restrictive covenants and choice of governing law, and that all breaches thereof injures FTI in Maryland and elsewhere.

64.     The limitations posed by the restrictive covenants at issue are reasonable as to time, geographic area, and the scope of the restrained activity. FTI has valid business reasons for imposing the restrictions as set forth above, and the covenants do not impose an unreasonable restraint upon FTI professionals that is greater than necessary to protect FTI's interests.

65.     Secretariat wrongfully and without justification, legitimate financial interest or competitive privilege, has and continues to: (a) solicit and induce FTI clients to breach their actual and prospective service contracts with FTI; and (b) solicit and induce FTI professionals to breach their FTI employment contracts by (i) withholding effective notice of termination to FTI and/or failing to provide the contractually agreed notice; (ii) not working full-time and/or devoting all of their business time, attention, and energies to, on behalf of, and for the benefit of FTI and engaging in any activity which conflicts or interferes with the performance of their duties and responsibilities to FTI; (iii) entering into prohibited competition with FTI; (iv) soliciting FTI clients to stop doing business with FTI both before and after they depart FTI's employ; and (v) soliciting and inducing other FTI professionals to breach their fiduciary and loyalty duties to, and employment agreements with, FTI.

66.     Secretariat's wrongful conduct includes: (a) inducing FTI professionals to breach their fiduciary duties and employment contracts with FTI; (b) inducing FTI professional to not work full-time and/or devote all of their business time, attention,

and energies to, on behalf of, and for the benefit of FTI and engage in activities on behalf of Secretariat which conflict or interfere with the performance of their duties and responsibilities to FTI; (c) falsely advising FTI employees, prior to or after hiring them, that their FTI employment contracts are not enforceable in whole or part; (d) offering to indemnify FTI professionals against any damages or other payments owed to FTI for breaching their employment contracts and fiduciary duties; (e) urging, directing, or encouraging FTI professionals not to provide effective notice of terminations to FTI; (f) imposing conflict of interests on FTI professionals by directing them, prior to their departures from FTI, not to respond to or deal with FTI to resolve employment contract breaches and FTI client service needs prior to their departures from the Company; and (g) encouraging and incentivizing FTI employees to provide Secretariat with confidential and trade secret information about FTI personnel matters and other proprietary information.

67. Secretariat is wrongfully benefitting from its interference with FTI's professional employee contracts, prospective employee relationships, client contracts, and an intact, trained, and experienced group of consultants which FTI developed at substantial expense, and significant client contracts which FTI developed at substantial expense. The foregoing has resulted in monetary gain to Secretariat and significant harm to FTI.

68.    At all relevant times, Secretariat was a stranger to the FTI employment contracts, prospective contracts, and business relationships with which Secretariat unlawfully interfered. Secretariat: (a) was not a signatory to any of FTI's employment and client contracts and business relationships with which it interfered; (b) was not an intended or unintended beneficiary of any of FTI's employment and client contracts and business relationships; (c) had no direct economic interest in or benefit from any FTI employment or client contract or business relationship; (d) was not part of any interwoven contractual arrangement between or among FTI and its professional employees, contractual clients, prospective employees or clients, or other business relationships, and had no other legitimate privilege or financial interest in inducing the breach of any FTI employment or client contract.

69.    Secretariat's conduct was intentional and for the improper and wrongful purposes of: (a) interfering with FTI's contractual and prospective professional employee and client relationships; (b) unlawfully and unfairly competing with FTI; and (c) harming FTI's business.

70.    FTI has suffered injury and damages as a direct and proximate result of the challenged conduct, including but not limited to actual damages, lost profits, mitigation expenses, loss of value and goodwill of FTI's impacted practice groups commensurate at least with the forecast revenues from customers and employees who were the targets of the interference alleged.

71.    FTI has been significantly damaged by Secretariat's tortious interference with its prospective and actual employment and client contracts, and is entitled to recover all available damages resulting from Secretariat's misconduct.

72.    FTI is also entitled to an award of its attorneys' fees and the costs of this litigation pursuant to O.C.G.A. § 13-6-11 because Secretariat has acted in bad faith, has been stubbornly litigious, and has caused FTI unnecessary trouble and expense.

73.    Secretariat's conduct exhibits willful misconduct, malice, fraud, wantonness, oppression, or that entire want of care that would raise the presumption of conscious indifference to consequences, such that FTI is entitled to punitive damages in an amount to be determined at trial.

**COUNT II**
**CIVIL CONSPIRACY**

74.    The facts and allegations of the preceding paragraphs are re-alleged and adopted by reference herein.

75.    Secretariat, its private equity backers, the aforementioned former FTI professionals, and certain other former FTI professionals not identified herein were and remain members of a combination of two or more persons, the object of which is to injure FTI in its business by raiding and misappropriating FTI professionals who are subject to non-compete and/or non-solicitation and non-disclosure obligations to FTI, interfering with FTI's contractual and prospective client and

business relationships, imposing conflicts of interest upon current and former FTI professionals, and misappropriating FTI's confidential information.

76.     Secretariat's unlawful acts committed in furtherance of this conspiracy include one or more of the following: misappropriating FTI confidential and trade secret information from FTI professionals before and after they left FTI, unlawful direct and indirect solicitation of other FTI professionals to leave FTI in violation of their employment agreements; and unlawful solicitation of FTI clients and prospective clients via FTI professionals before and after they left FTI, in violation of contractual and fiduciary non-solicitation obligations.

77.     The conspiracy has as its object the impairment of competition from FTI's competing practice groups and corresponding benefit to Secretariat, as well as the misappropriation of FTI's confidential and trade secret information through improper means, and the wrongful interference with FTI's employee contracts and customer contracts and relationships, among other unlawful and injurious aims directed to harm FTI in Maryland and elsewhere.

78.     As a result of the conspiracy, FTI has suffered and will continue to suffer direct and proximate damages including but not limited to actual damages, lost profits, consequential damages, loss of value, goodwill, and customer relationships in its business.

79.     FTI is also entitled to an award of its attorneys' fees and the costs of

this litigation pursuant to O.C.G.A. § 13-6-11 because Secretariat has acted in bad faith, has been stubbornly litigious, and has caused FTI unnecessary trouble and expense.

80.     Secretariat's conduct exhibits willful misconduct, malice, fraud, wantonness, oppression, or that entire want of care that would raise the presumption of conscious indifference to consequences, such that FTI is entitled to punitive damages in an amount to be determined at trial.

## COUNT III
## INDUCING, AIDING and
## ABETTING BREACH OF FIDUCIARY DUTY and BREACH OF
## DUTY OF LOYALTY

81.     The facts and allegations of the preceding paragraphs are re-alleged and adopted by reference herein.

82.     Throughout their employment at FTI, the conflicted FTI professionals owed FTI a common law fiduciary duty and duty of loyalty including, but not limited to a duty to act in FTI's best interests, not divert corporate opportunities from FTI, and not take any other actions on matters for which any of them had a conflict of interest with FTI.  At all times relevant, Secretariat knew that the professionals it targeted owed the foregoing duties to FTI.

83.     At all times relevant, Secretariat knew that the FTI professionals it was recruiting were breaching their fiduciary duties and duties of loyalty by: (a) taking direction from Secretariat on FTI client and personnel matters while still employed

at FTI; (b) holding themselves out as Secretariat employees while still employed at FTI; (c) taking direction from Secretariat not to deal with FTI on client or personnel matters while still employed at FTI; (d) accepting Secretariat's offers of competing employment but refusing to advise FTI about the identity of their new employer, or the nature and scope of their new employment at Secretariat; (e) soliciting FTI clients for Secretariat while waiting several weeks or months before advising FTI that they had accepted competing management positions at Secretariat; (f) soliciting remaining FTI professionals to leave FTI the company before and after leaving FTI; (g) falsely advising former FTI employees, prior to or after hiring, that their FTI employment contract restrictive covenants were not enforceable; (h) offering to indemnify former FTI employees against any damages owed to FTI for breaching their fiduciary duties to and employment agreements with FTI; and (i) engaging in marketing activities on behalf of Secretariat while still employed at FTI. All of the foregoing conduct was taken by conflicted FTI professionals at Secretariat's active direction, suggestion, participation, or knowledge.

84. Secretariat knew that the foregoing conduct infected FTI professionals with an irreconcilable conflict of interest against FTI from the moment they agreed to begin working for Secretariat, if not sooner.

85. The foregoing induced breaches of fiduciary duty and duty of loyalty has caused and is likely to continue to cause FTI damage including but not limited

to actual damages, lost profits, consequential damages, loss of value of its business, loss of goodwill, lost profits of the forecasted business that would have been generated by FTI professionals, and costs of replacements associated with the positions left vacant by the former FTI employees.

86.    Secretariat wrongfully benefited from the foregoing induced breaches of fiduciary duty and duty of loyalty owed by FTI's senior management and director-level employees to FTI, through Secretariat's acquisition of FTI professionals, clients, prospective client and professional relationships, goodwill, and the other means as alleged above.

87.    FTI has been damaged by Secretariat's aiding and abetting the breach of the above-referenced conflicted FTI professional's fiduciary duties and duties of loyalty to FTI, and FTI is entitled to recover all available damages for Secretariat's misconduct.

88.    Secretariat's conduct exhibits willful misconduct, malice, fraud, wantonness, oppression, or that entire want of care that would raise the presumption of conscious indifference to consequences, such that FTI is entitled to punitive damages in an amount to be determined at trial.

89.    FTI is also entitled to an award of its attorneys' fees and the costs of this litigation pursuant to O.C.G.A. § 13-6-11 because Secretariat has acted in bad faith, has been stubbornly litigious, and has caused FTI unnecessary trouble and

expense.

**COUNT IV**
**MISAPPROPRIATION OF TRADE SECRETS UNDER THE DEFEND**
**TRADE SECRETS ACT, 18 U.S.C. §1836 ("DTSA")**

90.    The facts and allegations of the preceding paragraphs are re-alleged and adopted by reference herein.

91.    FTI owns trade secrets including tangible and intangible financial, business, and economic information about its confidential customer lists, prospective customer and professional employees, project pricing and bidding models, personnel matters including but not limited to compensation, financial data about FTI's performance and the performance of individual professionals at FTI, marketing and business plans and projections, previous and pending project bids, service delivery methods, information about FTI's existing and future business development activities, and other FTI strategic business plans.

92.    FTI takes reasonable measures to keep its trade secrets confidential and prevent further disclosure or nonauthorized use of those secrets outside of the Company, including but not limited to: (a) limiting access to Company trade secrets on a need-to-know basis, (b) using password protected and encrypted electronic databases to maintain restricted access to FTI and client trade secret information; and (c) requiring professional employees with access to FTI trade secrets to enter detailed written contracts agreeing not to (i) disclose FTI or client trade secrets to

any third parties nor use FTI trade secrets in any nonauthorized manner, (ii) compete directly with FTI in defined Market Areas for a period of one year following their departure from FTI; and/or (iii) solicit FTI clients, prospective clients, and employees for a period of one year following their departure from FTI.

93.     FTI owns all right, title, and interest to its trade secrets, which relate to the competitive pursuit, management, and successful delivery of consulting projects and services worldwide – services which are used in or intended for use in interstate or foreign commerce.

94.     FTI derives a competitive advantage from maintaining the confidentiality of its trade secrets, which have independent, actual or potential economic value from not being generally known to, and not being readily ascertainable through proper means by, other persons or entities who may obtain economic value from the disclosure or use of FTI's trade secrets.  In particular, FTI uses its trade secrets to manage and maintain a large staff of professionals, and to bid upon and provide services that are more competitively priced or managed compared to those offered by FTI competitors like Secretariat.  The trade secrets at issue are vital to the maintenance of FTI's competitive advantages in its consulting business, which is based on personal services pursued, bid upon, negotiated, and delivered by professional experts in a variety of economic fields and industry

sectors. Maintaining the secrecy of FTI's trade secrets is thus critical to ensuring that FTI can compete effectively for consulting projects.

95. Upon information and belief based on the facts alleged in this Complaint, and further proof in the sole possession of Secretariat and the former FTI professionals now in Secretariat's employ, Secretariat has misappropriated and is misusing FTI trade secrets in the possession of recently-recruited FTI professionals. The misappropriated trade secrets include but are not limited to FTI customer lists, personnel information including performance evaluations, compensation levels, and other confidential information bearing on the relative skills and merits of FTI professionals in various practice groups, financial information, marketing information, and other confidential strategic business information constituting FTI trade secrets. This information derives independent economic value, both actual and potential, from not being generally known to, and not being readily ascertainable through proper means by, competitors or any another third parties who may derive economic value from the improper disclosure or use of the information.

96. The trade secrets of FTI that have been misappropriated by Secretariat relate to services used in, or intended for use in, interstate commerce.

97. Secretariat's actions constitute misappropriation in violation of the DTSA. Among other things, Secretariat knew or had reason to know that it had acquired FTI's trade secrets by improper means, including but not limited to its

inducement of the FTI professionals at issue to breach their duties to maintain the secrecy of FTI's trade secrets.

98.    As a result of Secretariat's willful and malicious misappropriation of FTI's trade secrets, FTI has suffered and continues to suffer damages in an amount to be proven at trial.  Among other things, Secretariat's misuse and misappropriation of FTI trade secrets has caused and is likely to continue to cause FTI damages, including but not limited to actual damages for loss of the trade secret, lost profits, damages for unjust enrichment that is not measured by actual loss; or, in lieu thereof, a reasonable royalty for use of the misappropriated information, and attorneys' fees.

99.    Secretariat's actions will continue to cause irreparable harm and damages to FTI and its trade secret information if Secretariat is not permanently restrained.  FTI is entitled to an injunction enjoining actual or threatened misappropriation, and an order requiring any affirmative actions necessary for the protection of its trade secrets.

## COUNT V
## MISAPPROPRIATION OF TRADE SECRETS UNDER THE GEORGIA TRADE SECRETS ACT

100.    The facts and allegations of the preceding paragraphs are re-alleged and adopted by reference herein.

101.    The Georgia Trade Secrets Act, O.C.G.A. § 10-1-760, *et seq*. (the "GTSA"), prohibits any person from misappropriating trade secrets by improper

means, e.g., theft, bribery, breach of contract or other duty, including inducement of such breach.

102.   The "actual or threatened misappropriation [of a trade secret] may be enjoined." O.C.G.A. § 10-1-762.   In addition to or in lieu of injunctive relief, a person is entitled to recover damages for trade secret misappropriation. O.C.G.A. § 10-1-763.

103.   As set forth above, FTI owns trade secrets including tangible and intangible financial, business, and economic information about its confidential customer lists, prospective customer and professional employees, project pricing and bidding models, personnel matters, financial data about FTI's performance and the performance of individual professionals at FTI, marketing and business plans and projections, previous and pending project bids, service delivery methods, information about FTI's existing and future business development activities, and other FTI strategic business plans.

104.   FTI takes reasonable measures to keep its trade secrets confidential and prevent further disclosure or nonauthorized use outside of the Company, including but not limited to: (a) limiting access to company trade secrets on a need-to-know basis, (b) using password protected and encrypted electronic databases to maintain restricted access to FTI and client trade secret information; and (c) requiring professional employees with access to FTI trade secrets to enter detailed written

contracts agreeing not to (i) disclose FTI or client trade secrets to any third parties nor use FTI trade secrets in any nonauthorized manner, (ii) compete directly with FTI in defined Market Areas for a period of one year following their departure from FTI; and/or (iii) solicit FTI clients, prospective clients, and employees for a period of one year following their departure from FTI.

105.   FTI owns all right, title, and interest to its trade secrets, which relate to the competitive pursuit, management, and successful delivery of consulting projects and services worldwide – services which are used in or intended for use in interstate or foreign commerce.

106.   FTI derives a competitive advantage from maintaining the confidentiality of its trade secrets, which have independent, actual or potential economic value from not being generally known to, and not being readily ascertainable through proper means by, other persons or entities who may obtain economic value from the disclosure or use of FTI's trade secrets.  In particular, FTI uses its trade secrets to manage and maintain a large staff of professionals, and to bid upon and provide services that are more competitively priced or managed compared to those offered by FTI competitors like Secretariat.  The trade secrets at issue are vital to the maintenance of FTI's competitive advantage in its consulting business based on personal services pursued, bid upon, negotiated, and delivered by professional experts in a variety of economic fields and industry sectors.

Maintaining the secrecy of FTI's trade secrets is thus critical to ensuring that FTI can compete effectively for consulting projects.

107.   Upon information and belief based on the facts alleged in this Complaint, and further proof in the sole possession of Secretariat and the former FTI professionals now in Secretariat's employ, Secretariat has misappropriated and is misusing FTI trade secrets in the possession of recently-recruited FTI professionals. The misappropriated trade secrets include but are not limited to FTI customer lists, personnel information, financial information, marketing information, and other confidential strategic business information constituting FTI trade secrets. This information derives independent economic value, both actual and potential, from not being generally known to, and not being readily ascertainable through proper means by, competitors and any other persons who may obtain economic value from the unauthorized disclosure or use of the information.

108.   Secretariat's actions constitute misappropriation in violation of the GTSA. Among other things, Secretariat knew or had reason to know that it had acquired FTI's trade secrets by improper means, including but not limited to its inducement of the FTI professionals at issue to breach their duties to maintain the secrecy of FTI's trade secrets.

109.   Secretariat misappropriated FTI's trade secrets by improper means within the meaning of O.C.G.A. § 10-1-761.

110.   FTI has suffered and will continue to suffer actual damages caused by Secretariat's misappropriation of its trade secrets in an amount to be proven at trial. Among other things, Secretariat's misuse and misappropriation of FTI trade secrets has caused and is likely to continue to cause FTI damages, including but not limited to actual damages for loss of the trade secret, lost profits, damages for unjust enrichment that is not measured by actual loss; or, in lieu thereof, a reasonable royalty for use of the misappropriated information.

111.   Secretariat's misappropriation of FTI's trade secrets was willful, wanton, reckless and malicious, entitling FTI to an award of exemplary damages in an amount authorized by O.C.G.A. § 10-1-763(b).

112.   Pursuant to O.C.G.A. § 10-1-764, FTI is entitled to an award of its attorneys' fees and costs incurred in this action because Secretariat has willfully and maliciously misappropriated the trade secrets of FTI.

**COUNT VI**
**UNJUST ENRICHMENT**

113.   FTI repeats and incorporates by reference the allegations contained in the foregoing paragraphs as if fully set forth herein.

114.   Secretariat has wrongfully derived substantial benefits from its misappropriation of FTI confidential information, professionals, practices, clients, and business including by its hiring away of the solicited directors in violation of

their non-competition, non-solicitation, and/or non-disclosure obligations to FTI, and the other wrongful conduct alleged above.

115.   Secretariat knew that FTI's construction group and its forensic accounting and investigation practice groups are highly profitable and valued in the tens of millions of dollars, yet Secretariat elected to raid those practice groups and has not fully paid FTI for the professionals, clients, and prospective employee and business relationships it pirated from the Company.

116.   Upon information and belief, each of the former FTI professionals identified in this Complaint remain employed by Secretariat.

117.   Allowing Secretariat to retain the value of the FTI professionals, practices, clients, and confidential information it misappropriated from FTI would be inequitable.

118.  Secretariat is liable to FTI for the benefits it received (and continues to receive) in an amount to be determined at trial.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff FTI prays that judgment be entered in FTI's favor, and that FTI be awarded costs and any and all such relief, general or special, at law or in equity, to which FTI may show itself justly entitled.

Plaintiff further prays for the following relief from and against Defendant Secretariat:

(i)     A judgment that Secretariat tortiously interfered with FTI's employment and client contracts, and business relationships with prospective professional employees and clients by inducing FTI professionals to violate their contractual non-compete, non-solicitation, and/or non-disclosure covenants and other applicable provisions of their contracts;

(ii)    A judgment that Secretariat induced, aided, and abetted the aforementioned FTI professionals' breach of fiduciary duties and duties of loyalty to FTI;

(iii)   A judgment that Secretariat engaged in an unlawful civil conspiracy with one or more of the conflicted FTI professionals to misappropriate FTI's trade secret and confidential information, recruit and hire other former FTI employees in violation of their employment agreements with FTI; induce other FTI professionals to breach their employment agreements with, and fiduciary duties owed to, FTI; and use FTI proprietary marketing materials and business strategies in the development of Secretariat's competing business;

(iv) A judgment that Secretariat misappropriated FTI's trade secrets by improper means within the meaning of the DTSA and the GTSA;

(v) A judgment that Secretariat is liable to FTI for the benefits it unjustly received (and continues to unjustly receive) as a result of its wrongful conduct;

(vi)   An award to FTI for actual damages incurred as a proximate cause of Secretariat's unlawful conduct as alleged herein, and disgorgement of benefits unjustly retained by Secretariat; FTI's lost profits; loss of goodwill or business value; exemplary damages; attorneys' fees; pre- and post-judgment interest; and such other and further relief to which FTI may justly be entitled;

(vii)   A permanent injunction enjoining Secretariat from further tortious conduct alleged; from recruiting and hiring any FTI personnel in a manner that induces their breach of fiduciary duties and duties of loyalty, and contractual non-compete, non-solicitation, and non-disclosure duties, owed to FTI; and from further misappropriation of FTI's trade secrets and confidential information; and for such other remedial measures necessary to restore FTI's *status quo ante*, together with compliance reporting conducted by an independent auditor for a reasonable period following entry of judgment;

(viii) An order requiring Secretariat to return and purge all documents and electronically stored information containing FTI's trade

secret and confidential information and restraining Secretariat from

using in any manner, or otherwise disclosing to any third party, any and

all trade secret and other confidential information in its possession,

custody, or control which Secretariat received or took from FTI;

(ix)   An award of FTI's reasonable attorneys' fees and the

expenses of litigation incurred in pursuing this Complaint;

(x)   Exemplary or punitive damages; and

(xi)   All such other relief as the Court deems just and proper.

DATED:  March 28, 2024               Respectfully submitted,

                                     BERMAN FINK VAN HORN P.C.

                              By:    */s/ Benjamin I. Fink*
                                     Benjamin I. Fink
                                     Georgia Bar No. 261090
                                     Cheralynn M. Gregoire
                                     Georgia Bar No. 309760
                                     3475 Piedmont Road, N.E., Suite 1640
                                     Atlanta, Georgia 30305
                                     (404) 261-7711
                                     bfink@bfvlaw.com
                                     cgregoire@bfvlaw.com

                    and

                                     Thomas E. Gilbertsen (to be admitted
                                     *pro hac vice*)
                                     DUEFFERT GILBERTSEN PLLC
                                     1627 Connecticut Avenue N.W. Ste 6
                                     Washington, D.C.  20009
                                     (202) 552-7410
                                     tgilbertsen@dueffertlaw.com

                                     **ATTORNEYS FOR FTI**