# EXHIBIT A

**EMPLOYMENT AGREEMENT**

EMPLOYMENT AGREEMENT ("Agreement") executed on ██████████ by and between FTI, LLC, a Maryland limited liability company ("FTI, LLC"), FTI Consulting, Inc., a Maryland corporation ("FTI Consulting"), and the individual named on Schedule I ("Employee"). FTI, LLC, FTI Consulting, and all of their respective subsidiaries, affiliates and entities, are hereinafter referred to collectively as the "Company."

FTI Consulting agrees to recommend that the Compensation Committee of the Board of Directors of FTI Consulting admit the Employee as a participant to the FTI Consulting, Inc. Key Senior Managing Director Incentive Plan for the United States (the "KSIP"), in accordance with the terms thereof in effect, and the applicable forms of promissory note, cash award agreement and restricted stock award agreement under the KSIP, at the award levels set forth in Section 4 of Schedule I to this Agreement (the "Employee KSIP Awards"), at the next scheduled meeting of the Compensation Committee, which is currently scheduled for on or about ██████████. In the event that FTI Consulting has not received all requisite approvals of the Employee KSIP Awards on or about ██████████ this Agreement shall be of no force and effect and your employment arrangements in effect prior to your execution of this agreement shall remain in full force and effect, without the need to take any further actions.

Notwithstanding anything in this agreement to the contrary, the "Effective Date" shall be the later of (i) the date of execution or (ii) the date that the Compensation Committee approves and authorizes your admission as a participant in the KSIP and the related awards under item 4 of Schedule I hereto.

1.    Employment Agreement.  FTI, LLC (the "Employer") will employ Employee and Employee accepts such employment upon the terms and conditions set forth in this Agreement. Except as otherwise provided in this Agreement (including Schedule I hereto, which is incorporated by reference herein), this Agreement supersedes and replaces in its entirety all offer letters, employment letters, employment agreements and service agreements (the "Prior Employment Agreement") of whatever kind and nature previously entered into by you, on the one hand, and the Company, on the other hand, and all rights, duties and obligations of all parties thereunder, including rights and obligations with respect to payments, compensation and benefits both during the term and following termination thereof, will immediately terminate and be of no further force and effect as of the Effective Date of this Agreement. The Employee acknowledges and agrees that the termination of the Prior Employment Agreement will not trigger any "Good Reason" or other termination rights, and payment or compensation obligations thereunder of any party thereto.

2.    Term of Employment.  Employee's employment under this Agreement will be for a term of five (5) years from the Effective Date, and the term of this Agreement will automatically extend for an additional year from year to year, unless this Agreement is otherwise terminated pursuant to the provisions of Section 9 of this Agreement.

1

3.    Position and Duties. Employee will be employed as a senior managing director in the Company's Forensic and Litigation Consulting ("FLC") segment with such duties and responsibilities that are consistent with that position, or as may from time to time be assigned to Employee by the leader of FLC or designee, senior business executive to whom Employee reports or the Chief Executive Officer of the Company, and will have such authority as may be reasonably necessary for Employee to carry out his or her duties and responsibilities.  Employee will undertake such travel within or without the United States necessary to the performance of Employee's duties and responsibilities.

Employee will work full-time and devote all of Employee's business time, attention, and energies to, on behalf of, and for the benefit of the Company.  Employee will not, without the written consent of the Company: (i) render service to others for compensation, or (ii) serve on any board or governing body of another for profit entity. Employee will not engage in any activity which conflicts or interferes with the performance of Employee's duties and responsibilities hereunder. Employee may engage in personal, charitable, and professional activities, (i) subject to compliance with the Company's normal conflicts procedures, and (ii) provided such activities do not conflict or materially interfere with the ability of Employee to perform the duties and responsibilities hereunder. If an outside activity subsequently creates a conflict with the Company's business or prospective business, Employee agrees to cease engaging in such activity at such time.

Employee will observe and adhere to all applicable written Company policies and procedures adopted from time to time, including, without limitation, the Company's Policy on Ethics and Business Conduct, Anti-Corruption Policy, Acceptable Use Policy and Policy on Inside Information and Insider Trading, such as they now exist or hereafter are supplemented, amended, modified or restated.

4.    Salary and Compensation.

(a)    Salary.  Employee's annual rate of salary ("Salary") is set forth on Schedule I.  The Company agrees to annually evaluate Employee's performance and Salary.  The Company, in its sole discretion, may increase or decrease Employee's Salary at any time, subject to Section 9 of this Agreement. Employee's Salary will be paid in accordance with the Company's customary payroll practices (including, but not limited to, practices regarding timing and withholding), but not less frequently than monthly.

(b)    FTI Key Senior Managing Director Incentive Plan.  Employee will be eligible to participate in all or part of the FTI Consulting's KSIP, in accordance with the terms thereof in effect. FTI Consulting, in its sole discretion, may terminate or from time to time may amend or modify the KSIP without notice; provided, however, (i) such action may not adversely affect awards already issued to Employee, and (ii) if any such action would diminish Employee's overall economic opportunity to earn incentive compensation under the current KSIP, then the Company will provide other incentive compensation opportunities to Employee under the KSIP or

otherwise in order to avoid a diminution of any such overall economic opportunity. There is no guarantee, however, as to the amount, if any, that Employee may earn under the KSIP.

(c)     Bonus Plan(s).  Employee may participate in any bonus plan(s) offered by the Company from time to time in which Employee is eligible to participate pursuant to the terms of the bonus plan(s) (the "Bonus Plans"). The Employer or FTI Consulting, in its sole discretion, may terminate or from time to time may amend or modify the Bonus Plan, provided, however, (i) such action may not adversely affect bonuses already awarded to Employee and (ii) if any such action would diminish Employee's overall economic opportunity to earn bonuses under the Bonus Plan, then the Company will provide other bonus opportunities to Employee or otherwise in order to avoid a diminution of any such overall economic opportunity. There is no guarantee, however, as to the amount, if any, that Employee may earn under any Bonus Plan(s).

(d)     Terminated Incentive Compensation Program(s).  To the extent applicable, effective as of the Effective Date of this Agreement, your participation in the incentive compensation plans and programs set forth in Section 10 of Schedule I of this Agreement is hereby immediately terminated (the "Terminated Incentive Programs"), and you will no longer be eligible to receive any awards thereunder whatsoever. However, outstanding awards and/or loans awarded pursuant to any Terminated Incentive Program or any Prior Employment Agreement will continue to remain outstanding and in full force and effect in accordance with the terms and conditions of the applicable award agreement or loan instrument. For the avoidance of doubt, defined terms in any applicable outstanding award agreement or loan instrument that are not defined therein shall have the meanings set forth in the Prior Employment Agreement in effect on the date such award or loan was granted or funded, as the case may be.

5.     Employee Benefit Programs and Perquisites.

(a)     General.  Employee will be eligible to participate in such qualified and nonqualified employee pension plans, group health, long term disability and group life insurance plans generally maintained or provided by the Company from time to time to or for the benefit of its employees generally ("Benefit Plans"), at a level commensurate with Employee's position and Company policy regarding other similarly situated Company employees, provided that Employee meets the prerequisites and eligibility factors established by the Company for participation in the Benefit Plans. Employee will also be eligible to participate in any other welfare and fringe benefit plans, arrangements, programs and perquisites, including equity-based incentive compensation plans or deferred compensation plans ("Fringe Benefit Plans"), provided that Employee meets the prerequisites and eligibility factors established by the Company for participation in the Fringe Benefit Plans. Employee's participation in any Benefit Plans or Fringe Benefit Plans will be subject to the terms of the applicable plan documents and the Company's generally applied policies. The Company in its discretion may from time to time adopt, modify, interpret, or discontinue such plans or policies.

      (b)    Paid Time Off.  Employee will be eligible to take (i) the number of days of paid time off ("PTO") set forth on Schedule I for each calendar year (pro-rated for partial calendar years) subject to the Company's policies on use and retention of such PTO in effect from time to time, plus (ii) any paid Company holidays.

      (c)    Reimbursement of Business Expenses.  Employee is authorized to incur reasonable expenses in carrying out Employee's duties and responsibilities under this Agreement, and the Company will promptly pay or reimburse Employee for all such expenses that are so incurred upon presentation of appropriate vouchers or receipts, subject to the Company's expense reimbursement policies in effect from time to time with respect to employees of the Company. In addition to any applicable policies of the Company, to ensure that reimbursements will not be treated as deferred compensation for Federal income tax purposes, the reimbursement of expenses will also be subject to the following conditions: (1) the expenses eligible for reimbursement in one taxable year shall not affect the expenses eligible for reimbursement in any other taxable year; (2) the reimbursement of eligible expenses shall be made promptly, subject to the Company's applicable policies, but in no event will reimbursements be made later than the end of the year after the year in which such expense was incurred; and (3) the right to reimbursement shall not be subject to liquidation or exchange for another benefit.

    6.    No Other Employment Restrictions.  Employee represents to the Company that Employee is not subject to any agreement, commitment, or policy of any third party that would prevent Employee from entering into or performing or continuing to perform the duties of Employee's employment under this Agreement. Employee will not enter into any agreement or commitment or agree to any policy that would prevent or hinder the performance of Employee's duties or obligations under this Agreement. Employee will not use in working for the Company and will not disclose to the Company any trade secrets or other information Employee does not have the right to use or disclose and that the Company is not free to use without liability of any kind.

    7.    No Payments to Governmental Officials.  Employee will not knowingly pay or authorize payment of any remuneration to or on behalf of any governmental official which would constitute a violation of applicable law. The Company will neither request nor require Employee to offer to make or make a payment of any remuneration to or on behalf of any governmental official other than those required or expressly permitted by applicable law.

    8.    Professional Licenses.  If Employee's duties or responsibilities hereunder require Employee to maintain licenses, certifications or memberships, either now or at any time in the future, in order to perform Employee's duties or responsibilities hereunder, or to remain in compliance with the law or the Company's policies and procedures related to professional licensure, Employee will procure and maintain all such licenses, certifications or memberships, the costs of which, if incurred by Employee, will be reimbursed by the Company. If applicable,

such licenses, certification or memberships encompassed by this Section 8 are listed in Schedule I.

9.   Termination of Employment.

(a)   Resignation.   Employee may resign his or her employment under this Agreement at any time upon at least forty-five (45) days prior written notice to the Company. The Company, at its sole discretion, may relieve Employee of his or her active duties. The Company may also waive such notice, and/or set an earlier termination date upon receipt of such notice, in which event Employee's employment will terminate on the earlier termination date, and no pay in lieu of notice will be due.

(b)   Termination by the Company for Cause.   The Company may terminate Employee's employment for "Cause" if Employee:

(i)   is convicted of or pleads nolo contendre to a felony;

(ii)   commits an act or omission involving dishonesty with respect to the Company or any of its respective employees, customers or affiliates, as reasonably determined by the Company;

(iii)   willfully fails or refuses to carry out the material responsibilities of Employee's employment by the Company, as reasonably determined by the Company;

(iv)   engages in gross negligence, willful misconduct, or a pattern of behavior which has had or is reasonably likely to have a significant adverse effect on the Company, as reasonably determined by the Company;

(v)   engages in any act or omission which is in material violation of the FTI Consulting, Inc. Policy on Ethics and Business Conduct, Anti-Corruption Policy, Acceptable Use Policy or Policy on Inside Information and Insider Trading, or any other policy governing the behavior of employees of the Company; or

(vi)   commits a breach of Employee's material obligations under this Agreement.

The Company may terminate Employee's employment under this Agreement for Cause (as defined in subparagraphs (i) through (vi) above) at any time, provided, however, that if the act or omission giving rise to the termination for Cause is curable by Employee, the Company will provide thirty (30) days written notice to Employee of its intent to terminate Employee for Cause, with an explanation of the reason(s) for the termination for Cause, and if Employee cures the act or omission within the thirty (30) day notice period, the Company will rescind the notice of termination and Employee's employment will not be terminated for Cause

5

at the end of the thirty (30) day notice period. Notwithstanding the foregoing, if Employee has previously been afforded the opportunity to cure and successfully cured under this provision, the Company will have no obligation to provide Employee with notice and an opportunity to cure prior to a termination for Cause. Unless Employee receives thirty (30) days' notice and an opportunity to cure under this Section, Employee's termination for Cause will be effective immediately upon the Company mailing or transmitting written notice of such termination to Employee.

(c)     Termination by the Company Without Cause. The Company may terminate Employee's employment under this Agreement without Cause at any time upon forty-five (45) days prior written notice to Employee.  The Company, at its sole discretion, may relieve Employee of his or her active duties during the notice period.  The Company may also provide forty-five (45) days' pay in lieu of notice. Employee's termination without Cause will be effective on the date of termination specified by the Company.

(d)     Termination Due to Disability.  If Employee becomes "Disabled" (as defined below), the Company may terminate Employee's employment.   For the purposes hereof, Employee and the Company agree that Employee will be considered "Disabled" if Employee is unable to substantially perform the customary duties and responsibilities of Employee's employment for one hundred and eighty (180) consecutive calendar days or one hundred and eighty (180) or more calendar days during any three hundred and sixty-five (365) calendar day period by reason of a physical or mental incapacity. Employee agrees that if Employee becomes "Disabled" under the definition of this Section 9(d), Employee will be unable to perform the essential functions of Employee's position and that there would be no reasonable accommodation which would not constitute an undue hardship to the Company. Therefore, as Employee would not be qualified for Employee's position, the Company would have the right to terminate Employee's employment under this Section 9(d). Employee's termination due to Disability will be effective immediately upon the Company mailing or transmitting written notice of such termination to Employee.

(e)     Termination Due to Death.  If Employee dies during the term of this Agreement, this Agreement will terminate on the date of Employee's death.

(f)     Termination by Employee for Good Reason.  Employee may terminate employment for "Good Reason" if one or more of the following conditions occurs without Employee's consent, Employee complies with the notice requirements of this Section 9(f) and the Company fails to cure such condition as provided in this Section 9(f): (1) a material diminution in Employee's authority, duties or responsibilities as set forth in the first paragraph of Section 3 of this Agreement; (2) relocation of Employee to an office more than fifty (50) miles from Employee's office on the Effective Date of this Agreement; (3) a material breach by the Company of this Agreement; or (4) a more than 20% reduction of Employee's average Salary for the prior 36-month period (or the average of available months as an FTI Employee, up to 36-months). Before terminating employment for Good Reason, Employee must provide the Company with

written notice of intent to terminate employment for Good Reason, specifying in reasonable detail the facts which establish the existence of Good Reason within sixty (60) days following the initial existence of such facts.  The Company shall have a period of sixty (60) days after receipt of such written notice to correct the situation (and thus prevent Employee's termination for Good Reason). If the Company does not correct the situation within the sixty (60) day period, Employee shall be entitled to terminate for Good Reason within ten (10) days following the end of such sixty (60) day period.

10.   Payments in the Event of Termination of Employment.

(a)   Termination of Employment by Resignation.  In the event of termination of Employee's employment with the Company due to resignation by Employee pursuant to Section 9(a), the Company will pay to Employee:  (i) the unpaid amount, if any, of Employee's Salary through the date of termination, (ii) the amount of any substantiated but previously unreimbursed business expenses incurred prior to the date of termination, and (iii) any additional payments, awards, or benefits, if any, which Employee is eligible to receive under the terms of any Benefit Plan or any Fringe Benefit Plan (collectively, "Accrued Compensation").

Employee will be eligible to exercise his or her rights to COBRA coverage for Employee, and, where applicable, Employee's spouse and eligible dependents, at Employee's expense, upon termination of Employee's employment. The Company may modify its obligations under this Section 10(a) to the extent reasonably necessary to avoid any penalty or excise taxes imposed on it under the Patient Protection and Affordable Care Act of 2010, as amended ("PPACA").

(b)   Termination of Employment by the Company for Cause.  In the event of termination of Employee's employment with the Company due to the Company's termination of Employee for Cause pursuant to Section 9(b), the Company will pay to Employee the Accrued Compensation (as defined in Section 10(a)).

(c)   Termination of Employment by the Company Without Cause, or Termination of Employment by Employee for Good Reason.  In the event of termination of Employee's employment with the Company due to the Company's termination of Employee without Cause pursuant to Section 9(c) or due to termination by Employee for Good Reason pursuant to Section 9(f), the Company will pay Employee (1) the Accrued Compensation (as defined in Section 10(a)) and (2) any bonus earned by Employee for the year ending prior to or coincident with the termination of Employee's employment, to the extent not previously paid or provided for.  The bonus payment (if any) provided for under the prior sentence will be payable in cash on the later of the termination date, or March 15th of the termination year.

If Employee has complied and continues to comply with the post-employment obligations under this Agreement (contained in Sections 11 through 16) for the Restricted Period (as defined in Section 17(a)), and if Employee timely executes and delivers a Release pursuant to Section 10(f) on or about the date of termination, Employee will receive: (1) continued payment of Salary for

a twelve (12) month salary continuation period (the "Salary Continuation Payments") (if an event of termination of Employee's employment pursuant to Sections 9(c) or 9(f) occurs less than six months after a reduction in Employee's Salary, the Salary Continuation Payments will be based on the Employee's Salary immediately prior to such salary reduction); provided that to the extent that the payment of any amount constitutes "nonqualified deferred compensation" for purposes of Section 409A of the Internal Revenue Code of 1986, as amended ("Code Section 409A"), any such payment scheduled to occur during the first sixty (60) days following the sixtieth (60th) day following such termination shall not be paid until the first regularly scheduled pay period following the sixtieth (60th) day following such termination and shall include payment of any amount that was otherwise scheduled to be paid prior thereto; and (2) continued group health and group life insurance coverage for Employee and, where applicable, Employee's spouse and eligible dependents as permitted under the PPACA, during the twelve (12) month period following termination at the same benefit and contribution levels in effect from time to time with respect to active employees of the Company ("Benefit Continuation Coverage"). If and to the extent the group health coverage under the Benefit Continuation Coverage is not permitted by the applicable plan or law and subject to Employee's timely election of continuation coverage under COBRA, Employee's COBRA coverage will begin immediately upon termination, and the Company will pay the premiums for group health coverage for Employee and, where applicable, Employee's spouse and eligible dependents under COBRA during the twelve (12) month salary continuation period. If Employee is eligible for the group health coverage under the Benefit Continuation Coverage, the Benefit Continuation Coverage will not be considered COBRA continuation coverage, and Employee and, where applicable, Employee's spouse and eligible dependents, will be eligible to exercise his, her or their rights under COBRA, at his, her or their expense, upon the expiration of the Benefit Continuation Coverage period. The Company may modify its obligations under this Section 10(c) to the extent reasonably necessary to avoid any penalty or excise tax imposed on it under PPACA.

(d)     Termination of Employment Due to Disability.   In the event of the termination of Employee's employment with the Company due to Disability, the Company will pay to Employee (1) any Accrued Compensation, as defined in Section 10(a) and (2) the bonus earned by Employee under the Bonus Plans for the year ending prior to or coincident with the termination of Employee's employment, to the extent not previously paid or provided for, and (3) payment of a pro rata bonus under the FLC segment's performance-based incentive bonus plan in which Employee is a participant for the year in which Employee's employment terminates, determined by multiplying Employee's bonus earned under such bonus plan for the year preceding the year in which Employee's employment is terminated by a fraction, the numerator of which is the number of days from the beginning of the calendar year in which Employee's termination occurs through the date of Employee's termination, and the denominator of which is three hundred sixty-five (365) (the "Pro Rata Bonus"). The bonus payments (if any) provided for under the prior sentence will be payable in cash on the later of the termination date, or March 15th of the termination year.

If Employee has complied and continues to comply with the post-employment

obligations under this Agreement (contained in Sections 11 through 16) for the Restricted Period (as defined in Section 17(a)), and if Employee (or Employee's guardian or personal representative) timely executes and delivers a Release pursuant to Section 10(f), Employee and, where applicable, Employee's spouse and eligible dependents, will receive Benefit Continuation Coverage. If and to the extent the group health coverage under the Benefit Continuation Coverage is not permitted by the applicable plan or law and subject to the Employee's timely election of continuation coverage under COBRA, Employee's COBRA coverage will begin immediately upon termination, and the Company will pay the premiums for group health coverage for Employee and, where applicable, Employee's spouse and eligible dependents, under COBRA during the twelve (12) month period following termination. If Employee is eligible for the group health coverage under the Benefit Continuation Coverage, the Benefit Continuation Coverage will not be considered COBRA continuation coverage, and Employee and, where applicable, Employee's spouse and eligible dependents, will be eligible to exercise his, her or their rights under COBRA, at his, her or their expense, upon the expiration of the Benefit Continuation Coverage period. The Company may modify its obligations under this Section 10(d) to the extent reasonably necessary to avoid any penalty or excise tax imposed on it under the PPACA.

(e)     Termination of Employment Due to Death.  In the event of the termination of Employee's employment with the Company due to death, the Company will pay to Employee's estate or other beneficiary (1) any Accrued Compensation (as defined in Section 10(a)), (2) the bonus earned by Employee under the Bonus Plans for the year ending prior to or coincident with the termination of Employee's employment, to the extent not previously paid or provided for, and (3) the Pro Rata Bonus (as defined in Section 10(d)).  The bonus payments (if any) provided for under the prior sentence will be payable in cash on the later of the termination date, or March 15th of the termination year.

If Employee's estate or other beneficiary timely executes and delivers a Release pursuant to Section 10(f) following the date of death, Employee's spouse and eligible dependents will receive continued group health and group life insurance coverage during the twelve (12) month period following Employee's death at the same benefit and contribution levels in effect from time to time with respect to spouses and eligible dependents of active employees of the Company ("Death Benefit Continuation Coverage"). If and to the extent the group health coverage under the Death Benefit Continuation Coverage is not permitted by the applicable plan or law and subject to the Employee's timely election of continuation coverage under COBRA, COBRA coverage will begin immediately upon Employee's death, and the Company will pay the premiums for group health coverage, where applicable, for Employee's spouse and eligible dependents under COBRA during the twelve (12) month period following Employee's death.  If Employee's spouse and eligible dependents are eligible for the group health coverage under the Death Benefit Continuation Coverage, the Death Benefit Continuation Coverage will not be considered COBRA continuation coverage, and Employee's spouse and eligible dependents will be eligible to exercise his, her or their rights under COBRA, at his, her or their expense, upon the expiration of the Death Benefit Continuation Coverage period. The Company may modify its obligations under this Section 10(e) to the extent reasonably necessary to avoid any penalty or

excise tax imposed on it under the PPACA.

(f)     Timely Execution of Release.  Employee (or Employee's estate or other beneficiary) shall provide FTI with an executed and effective general release (the "Release") of all claims arising under this Agreement or arising out of Employee's employment relationship with the Company, (substantially in the form attached as Exhibit A hereto). Such Release must be executed and delivered by the Employee or on behalf of his estate or beneficiaries, or legally authorized guardian or personal representative (and no longer subject to revocation) within sixty (60) days of the Employee's final day of employment, as a condition of receipt of any salary continuation or continued benefits pursuant to this Section 10 of this Agreement, in addition to the Accrued Compensation, and any accelerated vesting of stock options, restricted stock or other equity awards that have been awarded to the Employee prior to such termination event. Any amounts payable pursuant to this Section 10 shall not be paid until the first scheduled payment date following the date the Release is executed and delivered and no longer subject to revocation, with the first such payment being in an amount equal to the total amount to which Employee would otherwise have been entitled during the period following the date of termination if such deferral had not been required; provided, however, that to the extent that any such payments constitute "nonqualified deferred compensation" for purposes of Section 409A of the Internal Revenue Code of 1986, as amended ("Code Section 409A"), and the sixty (60) day period following the Employee's final day of employment begins in one taxable year of the Employee and ends in a second taxable year, then such payment will be made in the second taxable year to the extent necessary to avoid the adverse tax consequences under Code Section 409A, and, if such payments are required to be so deferred, the first payment shall be in an amount equal to the total amount to which Employee would otherwise have been entitled during the period following the date of termination if such deferral had not been required.

For the avoidance of doubt, the failure to timely execute and deliver a Release shall result in the forfeiture of all amounts payable upon termination of employment under this Section 10.

11.     Restrictive Covenants.

(a)     Sufficiency of Consideration/Reasonableness of Restrictions.  As a result of employment with the Company, Employee will have access to confidential information of the Company, the Company's customer relationships, and the Company's goodwill. Employee acknowledges that the consideration that Employee will receive pursuant to this Agreement serves as sufficient consideration for Employee's promises to abide by the restrictive covenants set forth in sections 11 through 19 of this Agreement and that such restrictions are reasonable.

(b)     Survival Post-Termination.  The rights and obligations set forth in Sections 11 through 19 of this Agreement will survive termination of this Agreement and of Employee's employment with the Company.

12.   Non-Competition Covenants.

Employee acknowledges that during the Restricted Period (defined below), Employee will not, directly or indirectly, be employed by (in a similar capacity and rendering similar services as when Employee was employed by the Company), lend money to, invest in, or engage in a Competing Business (defined below) in any Market Area (defined below). That prohibition includes, but is not limited to, acting, either singly or jointly or as agent for, or as an employee of or consultant or independent contractor to, any one or more persons, firms, entities, or corporations directly or indirectly (as a director, independent contractor, representative, consultant, member, or otherwise) in such Competing Business. Notwithstanding the foregoing, (a) Employee may own up to five percent (5%) of the outstanding capital stock of any corporation or other entity that is publicly traded, and (b) following the termination of Employee's employment hereunder, Employee may provide services as an officer, consultant, employee, director, partner or otherwise to an entity engaged in multiple business lines (including a business line that is a Competing Business) provided that the business line(s) for which Employee provides services is not a Competing Business.

13.   Non-Solicitation Covenants. During the Restricted Period, as defined below, Employee will not, directly or indirectly, whether for Employee or for any other individual or entity (other than the Company):

(a)   solicit business regarding any case or matter upon which Employee worked on behalf of the Company during the term of this Agreement;

(b)   solicit business from any person or entity who is a client of the Company's business in which Employee was engaged at the time of or at any time within a twenty-four (24) month period of time immediately prior to the termination of Employee's employment with the Company;

(c)   solicit, induce or otherwise attempt to influence any person who the Company employs or otherwise engages to perform services including, but not limited to, any employees, independent consultants, engineers, or sales representatives, or any contractor, subcontractor, supplier, or vendor of the Company, to leave the employ of or discontinue providing services to the Company, provided, however, that this restriction will not apply in the case of any clerical employee of the Company or in the case of any other employee whose employment with the Company has been terminated for at least one (1) year; or

(d)   if Employee is employed by, lends money to, invested or invests in, or engaged or engages in a Competing Business; send notifications or announcements of Employee's new business contact information, in each case following his/her departure from the Company to any person or entity that the Employee knows or reasonably should know is a client of the Company's business in which Employee was engaged at the time of or at any time within a twenty-four (24) month period of time immediately prior to the termination of Employee's employment with the Company.

11

14.    Confidential Information of the Company.   Employee's association with the Company under this Agreement has given and will give Employee access to Confidential Information (defined below) not generally known outside of the Company that may be of value to the Company or that has been given to the Company in confidence by third parties.  Employee acknowledges and agrees that using, disclosing, or publishing any Confidential Information in an unauthorized or improper manner would cause the Company substantial loss and damages that could not be readily calculated and for which no remedy at law would be adequate. Accordingly, Employee will not at any time, except in performing the duties of Employee's employment under this Agreement (or with the prior written consent of the Company), directly or indirectly, use, disclose, or publish any Confidential Information that Employee may learn or become aware of, or may have learned or become aware of because of Employee's association with the Company, or use any such information in a manner that is or may reasonably be likely to be detrimental to the business of the Company. For the purposes hereof, the term "Confidential Information" includes, without limitation, information not previously disclosed to the public or to the trade by the Company with respect to its present or future business, operations, services, products, research, inventions, discoveries, drawings, designs, plans, processes, models, technical information, facilities, methods, trade secrets, copyrights, software, source code, systems, patents, procedures, manuals, specifications, any other intellectual property, confidential reports, price lists, pricing formulas, customer lists, financial information, business plans, lease structure, projections, prospects, or opportunities or strategies, acquisitions or mergers, advertising or promotions, personnel matters, legal matters, any other confidential and proprietary information, and any other information not generally known outside the Company that may be of value to the Company, but excludes any information already properly in the public domain. Confidential Information also includes confidential and proprietary information and trade secrets that third parties entrust to the Company in confidence. The rights and obligations set forth in this Section will continue indefinitely.

15.    Property Rights.  Employee confirms that all Confidential Information is and must remain the exclusive property of the Company. All business records, business papers, and business documents kept or created by Employee in the course of Employee's employment by the Company relating to the business of the Company remain the property of the Company. Upon the termination of this Agreement or upon the Company's reasonable request at any time, Employee must promptly deliver to the Company any Confidential Information or other property belonging to the Company (written or otherwise) not otherwise in the public domain.  Employee will not, without the Company's consent, retain copies, excerpts, summaries, or compilations of the foregoing information and materials.

16.    Intellectual Property.

(a)    All records, in whatever media, documents, papers, inventions and notebooks, drawings, designs, technical information, source code, object code, processes, methods or other copyrightable or otherwise protected works Employee conceives, creates, makes, invents, or discovers or that otherwise relate to or result from any work Employee performs or performed for the Company or that arise from the use or assistance of the Company's facilities, materials, personnel or Confidential Information in the course of Employee's employment (whether or not during usual working hours), whether conceived, created, discovered, made, or invented individually or jointly with others, will, together with all the worldwide patent, copyright, trade secret, or other intellectual property rights in all such works, be and remain the absolute property of the Company. Employee irrevocably and unconditionally waives all rights that may otherwise vest in Employee (whether before, on, or after the date of this Agreement) in connection with Employee's authorship of any such copyrightable or patentable works in the course of Employee's employment with the Company, wherever in the world enforceable. Without limitation, Employee waives the right to be identified as the author of any such works and the right not to have any such works subjected to derogatory treatment. Employee recognizes any such works are "works for hire" of which the Company is the author.

(b)    Employee will promptly disclose, grant and assign ownership to the Company for its sole use and benefit any and all ideas, processes, inventions, discoveries, improvements, technical information, copyrightable works and/or patentable works that Employee develops, acquires, conceives or reduces to practice (whether or not during usual working hours) while employed by the Company. Employee will promptly disclose and hereby grant and assign ownership to the Company of all patent applications, letter patent, utility and design patents, copyrights and reissues thereof, or any foreign equivalents thereof, that may at any time be filed or granted for or upon any such invention, improvement, or information. In connection therewith:

(i)    Employee will, without charge but at the Company's expense, promptly execute and deliver such applications, assignments, descriptions and other instruments as the Company may consider reasonably necessary or proper to vest title to any such inventions, discoveries, improvements, technical information, patent applications, patents, copyrightable work or reissues thereof in the Company and to enable it to obtain and maintain the entire worldwide right and title thereto; and

(ii)    Employee will provide to the Company at its expense all such assistance as the Company may reasonably require in the prosecution of applications for such patents, copyrights or reissues thereof, in the prosecution or defense of interferences that may be declared involving any such applications, patents or copyrights and in any litigation in which the

Company may be involved relating to any such patents, inventions, discoveries, improvements, technical information or copyrightable works or reissues thereof. The Company will reimburse Employee for reasonable out-of-pocket expenses incurred and pay Employee reasonable compensation for Employee's requested time if the Company no longer employs Employee.

(c)     To the extent, if any, that Employee owns rights to works, inventions, discoveries, proprietary information, and copyrighted or copyrightable works, or other forms of intellectual property that are incorporated in the work product Employee creates for the Company, Employee agrees that the Company will have an unrestricted, nonexclusive, royalty-free, perpetual, transferable license to make, use, sell, offer for sale, and sublicense such works and property in whatever form, and Employee hereby grants such license to the Company.

(d)     This Section (relating to Copyright, Discoveries, Inventions and Patents) does not apply to an invention for which no equipment, supplies, facility or trade secret information of the Company (including any of its predecessors) was used and that was developed entirely on Employee's own time, unless (a) the invention relates (i) directly to the business of the Company, or (ii) the Company's actual or anticipated research or development, or (b) the invention results from any work Employee performed as an employee of the Company. The rights and obligations set forth in this Section will continue indefinitely.

17.     Definitions.  For purposes of Sections 11 through 16, the following terms will have the meaning set forth below:

(a)     Restricted Period.   The term "Restricted Period" means the period beginning on the Effective Date and ending on the expiration of the period ending twelve (12) months from the termination date of Employee's employment for any reason. Notwithstanding the foregoing, the duration of the Restricted Period will be extended by the amount of any and all periods that Employee violates any of the covenants of Sections 12 and 13.

(b)     Competing Business. The term "Competing Business" means any line of business, in which Employee was substantially engaged or about which Employee gained substantial Confidential Information during Employee's employment with the Company, that is conducted by the Company during the period of Employee's employment with the Company and at the time Employee's employment ends.

(c)     Market Area.  The term "Market Area" means any place, including but not limited to the continental United States, Europe, the United Kingdom, Asia and Australia, where the Company conducts any business and in which Employee (i) provided products for the Company, (ii) performed services for the Company or (iii) where the Company's clients for which Employee provided products or services are located. Employee acknowledges that due to the nature of the business conducted by the Company, this geographic scope is reasonable and necessary to protect the Company's legitimate protectable interests.

18.    Enforceability/Reformation. If any of the provisions of Sections 11 through 17 are deemed by a court or arbitrator having jurisdiction to exceed the time, geographic area, or activity limitations the law permits, the limitations will be reduced to the maximum permissible limitation, and Employee and the Company authorize a court or arbitrator having jurisdiction to reform the provisions to the maximum time, geographic area, and activity limitations the law permits; *provided, however,* that such reductions apply only with respect to the operation of such provision in the particular jurisdiction in which such adjudication is made.

19.    Remedies.

The parties hereby agree that the harm to the Company that would result by breach of Sections 12 or 13 of this Agreement by Employee and the resultant injury is difficult to estimate accurately and that actual damages cannot be easily ascertained. As a result, the parties agree that as remedy, in the event of a breach of Sections 12 or 13 of this Agreement by Employee, Employee agrees to pay to the Company the following certain sum:

(a) For Employee's breach of Section 12, a certain sum equaling Employee's prior 12 months total earned compensation (including salary, bonus, and incentive compensation but excluding Benefit Plans) from the Company;

(b) For Employee's breach of Section 13(a), (b) or (d), a certain sum equaling 25% of the total revenue earned by the Employee and/or any entity or person that may employ the Employee from the client or clients whom were solicited or contacted by Employee during the period ending twelve (12) months following the termination date of Employee's employment;

(c) For Employee's breach of Section 13(c), a certain sum equaling the prior 12 months total earned compensation (including salary, bonus, and incentive compensation but excluding Benefit Plans) from the Company of the employees who were solicited by Employee.

The parties hereby agree that the total damages for breach of Sections 12 and 13(a), (b), or (d) shall not exceed the greater of the sum under Section 19(a) or Section 19(b).

The parties acknowledge that the certain sums contained herein are a reasonable forecast of the just and fair compensation for the harm to the Company that would result by Employee's breach and is not a penalty.

In addition to and notwithstanding the preceding paragraph, the parties agree that, if there is a breach or threatened breach of any of the covenants in Sections 12 through 16 of the Agreement, the Company will be entitled to obtain a temporary restraining order and/or a preliminary or permanent injunction restraining Employee from engaging in prohibited activities or such other equitable relief as may be required to specifically enforce any of said covenants. In addition, the Company will be relieved of any obligation to provide to Employee any post-employment payments or benefits, which would otherwise occur, be continued, or become due and payable following such breach or threatened breach. Each party agrees that all

remedies expressly provided for in this Agreement are cumulative of any and all other remedies now existing at law or in equity. With respect to any breach of this Agreement by Employee (other than the specific breaches specifically described in and subject to the first paragraph herein), the Company specifically reserves its rights to and the Employee agrees that Employer shall be entitled to any and all remedies allowed as may now or hereafter exist at law or in equity for compensation, including but not limited to monetary damages. Each party agrees that no party hereto must post a bond or other security to seek an injunction. In the event that an arbitrator or court of competent jurisdiction declares that any of the remedies outlined in this Section 19 are unavailable as a matter of law, the remainder of the remedies outlined in this Section shall remain available to the Company.

20.    Assignment. The Company may assign or otherwise transfer this Agreement and any and all of its rights, duties, obligations, or interests under it to (a) any of the Company's affiliates or subsidiaries or (b) any successor to all or a material part of the business of the Company, or all or part of the Company's segment or practice or division in which Employee is employed. Upon such assignment or transfer, any such business entity will be deemed to be substituted for the Company for all purposes. Without the Company's prior written consent, Employee may not assign or delegate the obligations of Employee under this Agreement. The Company shall require any successor to all or substantially all of the business and/or assets of Company, or segment or practice or division of the Company's segment in which Employee is then employed, to expressly assume this Agreement.

21.    Severability. If the final determination of an arbitrator or a court of competent jurisdiction declares, after the expiration of the time within which judicial review (if permitted) of such determination may be perfected, that any term or provision of this Agreement is invalid or unenforceable, the remaining terms and provisions will be unimpaired, and the invalid or unenforceable term or provision will be deemed replaced by a term or provision that is valid and enforceable and that comes closest to expressing the intention of the invalid or unenforceable term or provision. Any prohibition or finding of unenforceability as to any provision of this Agreement in any one jurisdiction will not invalidate or render unenforceable such provision in any other jurisdiction.

22.    Amendment; Waiver. Except as provided in Section 30, neither Employee nor the Company may modify, amend, or waive the terms of this Agreement other than by a written instrument signed by Employee and the Company. Either party's waiver of the other party's compliance with any specific provision of this Agreement is not a waiver of any other provision of this Agreement or of any subsequent breach by such party of a provision of this Agreement. No delay on the part of any party in exercising any right, power or privilege hereunder will operate as a waiver thereof.

23.    Withholding. The Company will reduce its compensatory payments to Employee hereunder for withholding and FICA and Medicare taxes and any other withholdings and contributions required by law.

24.     Governing Law. The Agreement will be governed by the laws of the State of Maryland, without regard to any conflict of laws provisions.

25.     Notices. Notices may be given in writing by personal delivery, by certified mail, return receipt requested, by telecopy, or by overnight delivery. Employee should send or deliver notices to the Company, to the attention of the General Counsel, at 555 12th Street, NW, Suite 700, Washington, DC 20004. The Company will send or deliver any notice given to Employee at Employee's address as reflected on the Company's personnel records. Employee and the Company may change the address for notice by like notice to the other party. Employee and the Company agree that notice is deemed received on the date it is personally delivered, the date it is received by certified mail or the date of guaranteed delivery by overnight service.

26.     Superseding Effect. This agreement supersedes all prior or contemporaneous negotiations, commitments, agreements, and writings between Employee and the Company with respect to the subject matter. All such other negotiations, commitments, agreements, and writings will have no further force or effect, and the parties to any such other negotiation, commitment, agreement, or writing will have no further rights or obligations thereunder. Notwithstanding this provision, the terms of the KSIP, Benefit Plans, Fringe Benefit Plans, any deferred compensation plans, stock plans, stock option plans or any other benefit or award plans which are in effect will continue to be governed in accordance with their respective terms, and this Agreement does not supersede any bonus, stock option or restricted stock award made in connection with Employee's employment with the Company prior to the Execution Date.

27.     Arbitration.

(a)     Arbitrable Claims. The Company and Employee agree to attempt to resolve any employment related dispute between them quickly and fairly. Any such dispute which remains unresolved (including, but not limited to, disputes concerning employment with and/or termination of employment from the Company, the validity, interpretation, enforceability or effect of this Agreement or alleged violations of this Agreement, claims concerning a legally protected right, including without limitation, any common law claims such as breach of contract or commission of a tort, and any claims arising under the federal, state or local civil rights laws, Title VII of the Civil Rights Act of 1964, the Civil Rights Act of 1991, the Americans With Disabilities Act, the Age Discrimination in Employment Act, the Family and Medical Leave Act, 42 U.S.C. § 1981, the Worker Adjustment or Retraining Notification Act, and all other federal, state or local employment related statutes, ordinances and /or common law) shall be resolved exclusively by final and binding arbitration. Employee acknowledges that Employee waives the right to litigate the foregoing employment related legal claims in a judicial forum before a judge or jury.

This arbitration provision does not apply to (i) any Employee claim for workers compensation benefits, unemployment compensation benefits or denial of benefits under any ERISA plan, or to the filing of charges with government agencies, or (ii) any Company claim regarding theft, embezzlement, fraud, breach of confidentiality or non-disclosure, non-

competition or non-solicitation obligations, or trade secret, trademark, copyright or patent issues. Such claims may be brought in any court of competent jurisdiction.

(b)   Claim Initiation/Time Limits.  A party must notify the other party in writing at the addresses indicated in Section 25 of a request to arbitrate a dispute within the same statute of limitations applicable to the legal claim asserted. The written request for arbitration must specify: (i) the factual basis on which the claim is made; (ii) the statutory provision or legal theory under which the claim is made; and (iii) the nature and extent of any relief or remedy sought.

(c)   Procedures.  The arbitration will be administered in accordance with the Employment Dispute Resolution Rules ("Rules") of the American Arbitration Association ("AAA"), a copy of which is available upon request to the Company, in the metropolitan area in which Employee is then (or was last) employed before a single arbitrator, experienced in employment law and licensed to practice law in that jurisdiction, who has been selected in accordance with such Rules. The Company will pay the fees of the AAA and the arbitrator. However, in the event Employee requests arbitration, Employee will be required to contribute an amount equal to the fee required to file a complaint of the same type in the state court which is geographically closest to the site of the arbitration. Employee and the Company may be represented by counsel of their choosing at their own expense. However, attorneys' fees and costs may be awarded to a prevailing party in the discretion of the arbitrator.

(d)   Responsibilities of Arbitrator.  The arbitrator will act as the impartial decision maker of any claims that come within the scope of this arbitration provision. The arbitrator will have the powers and authorities provided by the Rules and the statute or common law under which the claim is made. For example, the arbitrator will have the power and authority to include all remedies in the award available under the statute or common law under which the claim is made including, without limitation, the issuance of an injunction. The arbitrator will apply the elements and burdens of proof, mitigation duty, interim earnings offsets and other legal rules or requirements under the statutory provision or common law under which such claim is made. The arbitrator will permit reasonable pre-hearing discovery. The arbitrator will have the power to issue subpoenas. The arbitrator will have the authority to issue a summary disposition if there are no material factual issues in dispute requiring a hearing and the Company or Employee is clearly entitled to an award in its, his or her favor. The arbitrator will not have the power or authority to challenge the Company's lawful personnel policies or to substitute his/her business judgment for the lawful business judgment of the Company which is not a breach of the provisions of this Agreement, or any related agreements or plans, including but not limited to the equity awards, the loan agreements, the bonus plans, or the KSIP. The arbitrator will not have the power or authority to add to, detract from or modify any provision of this Agreement, or any related agreements or plans, including but not limited to the equity awards, the loan agreements, the bonus plans or the KSIP. The arbitrator will not have the power or authority to direct the Company to issue, reissue, value, revalue or take any other similar action with respect to any equity awards, and, therefore, any award by the arbitrator in favor of Employee with respect to any equity award will be a cash equivalent award.  The arbitrator will issue a signed written

opinion and award that will include findings of fact and conclusions of law. If any monetary award is made, the arbitrator will specify the elements and factual basis for calculating the amount. The arbitrator's award will be enforceable, and a judgment may be entered thereon, in a federal or state court of competent jurisdiction in the state where the arbitration was held. The decision of the arbitrator will be final and binding, provided, however, limited judicial review may be obtained in a court of competent jurisdiction as permitted under applicable law.

     (e)   <u>Section 19 Remedies</u>. Notwithstanding the foregoing, each party shall be entitled to seek injunctive or other equitable relief, as contemplated by Section 19 above, from any court of competent jurisdiction, without the need to resort to arbitration.

28.   <u>Indemnification and Liability Insurance</u>. During the term of this Agreement and after the termination of this Agreement, the Company will indemnify Employee to the fullest extent permitted by applicable law with regard to Employee's actions (or inactions) on behalf of the Company, with advancement of legal fees on a current basis as permitted by law. The Company will cover Employee under professional and other appropriate liability insurance policies both during and, while any potential liability exists, after the term in the same amount and to the same extent, if any, as the Company covers its senior managing directors.

29.   <u>Cooperation in Legal Matters.</u> Employee will cooperate with the Company, during the term of Employee's employment and thereafter with respect to any pending or threatened claim, action, suit, or proceeding, whether civil, criminal, administrative, or investigative (the "Claims"), by being reasonably available to testify on behalf of the Company, and to assist the Company by providing information, meeting and consulting with the Company or its representatives or counsel, as reasonably requested. The Company will reimburse Employee for all out-of-pocket expenses reasonably incurred by Employee in connection with the Employee's provision of such testimony or assistance. If necessary, the Company will provide counsel to Employee at the Company's expense. Employee agrees not to disclose to or discuss with anyone who is not assisting the Company with the Claims, other than Employee's personal attorney, the fact of or the subject matter of the Claims, except as required by law. Employee further agrees to maintain the confidences and privileges of the Company and acknowledges that any such confidences and privileges belong solely to the Company and can only be waived by the Company, not Employee. In the event that Employee is subpoenaed to testify, or otherwise requested to provide information in any matter relating to the Company, Employee agrees to promptly notify the Company after receipt of such subpoena, summons or request for information, to reasonably cooperate with the Company with respect to such subpoena, summons or request for information, and to not voluntarily provide any testimony or information unless required by law or permitted by the Company.

30.   <u>Section 409A Compliance</u>.

     (a)   It is intended that any income to Employee provided pursuant to this Agreement or other agreements or arrangements contemplated by this Agreement will not be subject to interest and additional tax under Code Section 409A. The provisions of the Agreement

and such other agreements or arrangements will be interpreted and construed in favor of its meeting any applicable requirements of Code Section 409A. The Company, in its reasonable discretion, may amend (including retroactively) the Agreement and any such other agreements or arrangements in order to conform with Code Section 409A, including amending to facilitate the ability of Employee to avoid the imposition of interest and additional tax under Code Section 409A. The preceding provisions shall not be construed as a guarantee by the Company of any particular tax effect for any income to Employee provided pursuant to the Agreement or other agreements or arrangements contemplated by this Agreement. In any event, and except for the responsibilities set forth under Section 23, the Company will have no responsibility for the payment of any applicable taxes on income to Employee provided pursuant to this Agreement or other agreements or arrangements contemplated by this Agreement.

      (b)    Reimbursement of Business Expenses and Provision of In-Kind Benefits. Notwithstanding anything to the contrary in the Agreement, with respect to any reimbursement of expenses of, or any provision of in-kind benefits to, the Employee, as specified under this Agreement, the reimbursement of expenses or provision of in-kind benefits shall be subject to the following conditions: (1) the expenses eligible for reimbursement or the amount of in-kind benefits provided in one taxable year shall not affect the expenses eligible for reimbursement or the amount of in-kind benefits provided in any other taxable year; (2) the reimbursement of an eligible expense shall be made on or prior to the last day of the taxable year following the taxable year in which such expense was incurred; and (3) the right to reimbursement or in-kind benefits shall not be subject to liquidation or exchange for another benefit.

      (c)    Specified Employees.  Notwithstanding anything herein to the contrary, if Employee separates from service while the Employee is a "specified employee" (as defined under Code Section 409A), any payment of any amount or the provisions of any benefit which is "unqualified deferred compensation" (as defined under Treasury Regulation Section 1.409A-1(b)(1), after giving effect to the exemptions in Treasury Regulation Sections 1.409A-1(b)(3) through (b)(12)) that is scheduled to be paid within six (6) months after such separation from service shall be paid within 15 days after the end of the six-month period beginning on the date of such separation from service or, if earlier, within 15 days after Employee's death. For purposes of Code Section 409A, a right to a series of installment payments under this Agreement shall be treated as a right to a series of separate payments. Upon the expiration of the foregoing delay period, all payments and benefits which have been delayed (whether they would have otherwise been payable in a single sum or in installments in the absence of such delay) shall be paid or reimbursed to the Employee in a lump sum, and any remaining payments and benefits due under this Agreement shall be paid or provided in accordance with the normal payment dates specified for payment thereof pursuant to this Agreement.

      (d)    Installment Payments. For purposes of Code Section 409A, the Employee's right to receive a series of installment payments under this Agreement shall be treated as a right to a series of separate and distinct payments. Whenever a payment under this Agreement

specifies a payment period with reference to a number of days, the actual date of payment within the specified period shall be within the sole discretion of the Company.

      (e)    <u>Separation from Service</u>. A termination of employment shall not be deemed to have occurred for purposes of any provision of this Agreement providing for the payment of any amounts or benefits upon or following a termination of employment unless such termination is also a separation of service within the meaning of Code Section 409A. "Termination of employment" or words of similar import, as used in this Agreement, means "separation from service" as defined in Code Section 409A for purposes of any payments under this Agreement that constitute "non-qualified deferred compensation" subject to Code Section 409A.

      (f)    <u>No Offset</u>. Notwithstanding any other provision of this Agreement to the contrary, in no event shall any payment under this Agreement that constitutes "non-qualified deferred compensation" for purposes of Code Section 409A be subject to offset by any other amount unless permitted by Code Section 409A.

      (g)    <u>Effect of Prior Employment</u>. To the extent that any provision of this Agreement would result in a substitution, an impermissible deferral election or an impermissible acceleration of benefits previously provided under the Prior Employment Agreement for purposes of Code Section 409A, such provision will not take effect.

31.    <u>Miscellaneous Provisions.</u>

      (a)    This Agreement will be interpreted without reference to any rule or precept of law that states that any ambiguity in a document be construed against the drafter.

      (b)    Employee acknowledges that Employee has read and understands this Agreement and is entering into this Agreement knowingly and voluntarily.

      (c)    Notwithstanding the termination of Employee's employment hereunder for any reason or anything in this Agreement to the contrary, all post-employment obligations of the parties and any provisions necessary to interpret or enforce those obligations under any provision of this Agreement will survive the termination or expiration of this Agreement and remain in full force and effect for the periods therein provided.

      (d)    This Agreement may be executed in two or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

IN WITNESS WHEREOF, the undersigned have signed this Agreement as of the date first above written.

FTI, LLC
FTI CONSULTING, INC.



By: _____
Name:
Title:

ACCEPTED AND AGREED

SCHEDULE I



Exhibit A







AGREED: