IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

FTI CONSULTING, INC., et al.,

　　　Plaintiff,

　　　　　v.

SECRETARIAT ADVISORS, LLC,

　　　Defendant.

CIVIL ACTION FILE
NO. 1:24-CV-1356-TWT

## OPINION AND ORDER

This is a tortious interference with contracts case. It is before the Court on Defendant Secretariat Advisors, LLC's ("Secretariat") Motion to Dismiss [Doc. 7] and Plaintiffs FTI Consulting, Inc. and FTI, LLC's (collectively, the "FTI Plaintiffs" or "FTI") Motion for Certification to the Supreme Court of Georgia [Doc. 17]. For the reasons set forth below, Defendant Secretariat's Motion to Dismiss [Doc. 7] is GRANTED in part and DENIED in part, and Plaintiff FTI Consulting's Motion for Certification to the Supreme Court of Georgia [Doc. 17] is DENIED as moot.

## I.　Background[1]

This case arises from a dispute between the FTI Plaintiffs and Defendant Secretariat regarding Secretariat's hiring of former FTI professionals. The Complaint identifies by name ten individuals who were

---

[1] The Court accepts the facts as alleged in the Complaint as true for purposes of the present Motion to Dismiss. *Wilding v. DNC Servs. Corp.*, 941 F.3d 1116, 1122 (11th Cir. 2019).

allegedly "induced by Secretariat to breach their contracts, fiduciary duties and duties of loyalty with and to FTI and to share FTI's confidential and trade secret information with Secretariat...." (Compl. ¶ 5). These individuals were all senior employees at FTI, holding titles such as senior managing director and senior director, before moving to allegedly similar roles at Secretariat. (*Id.*).

Upon initially accepting senior roles at FTI, the employees at issue signed employment agreements that included non-compete, non-solicitation, and non-disclosure clauses. The non-compete clause is as follows:

> [D]uring the Restricted Period (defined below), Employee will not, directly or indirectly, be employed (in a similar capacity and rendering similar services as when Employee was employed by the Company), lend money to, invest in, or engage in a Competing Business (defined below) in any Market Area (defined below). . . . [F]ollowing the termination of Employee's employment hereunder, Employee may provide services . . . to an entity engaged in multiple business lines (including a business line that is a Competing Business) provided that the business line(s) for which Employee provides services is not a Competing Business."

(Compl., Ex. A  ("Employment Agreement") § 12 [Doc. 1-1]). The phrase "Restricted Period" refers to the period between the effective date of the employment contract and twelve months from the employee's termination. (*Id.* § 17(a)). "Competing Business" refers to "any line of business, in which Employee was substantially engaged or about which Employee gained substantial Confidential Information during Employee's employment with the Company, that is conducted by the Company during the period of Employee's

employment with the Company and at the time Employee's employment ends." (*Id.* § 17(b)). "Market Area" refers to "any place . . . where the Company conducts any business and in which Employee (i) provided products for the company, (ii) performed services for the Company or (iii) where the Company's clients for which Employee provided products or services are located."[2] (*Id.* § 17(c)). Section 17(c) regarding Market area additionally states: "Employee acknowledges that . . . this geographic scope is reasonable and necessary to protect the Company's legitimate protectable interests." (*Id.*).

The non-solicitation clause is as follows:

During the Restricted Period, . . . Employee will not, directly or indirectly, whether for Employee or for any other individual or entity (other than the Company):

(a) solicit business regarding any case or matter upon which Employee worked on behalf of the Company during the term of this Agreement;

(b) solicit business from any person or entity who is a client of the Company's business in which Employee was engaged at the time of or at any time within a twenty-four (24) month period of time immediately prior to the termination of Employee's employment with the Company; [or]

(c) solicit, induce or otherwise attempt to influence any person who the Company employs or otherwise engages to perform services . . . to leave the employ of or discontinue

---

[2] This "Market Area" definition is somewhat grammatically confusing. The Court construes it to mean "any place . . . where the Company conducts business" and (i) "in which Employee provided products for the Company, (ii) *in which Employee* "performed services for the Company," or (iii) "where the Company's clients for which Employee provided products or services are located." (*See* Employment Agreement § 17(c)).

> providing services to the company, provided, however, that this restriction will not apply . . . in the case of any [non-clerical] employee whose employment with the Company has been terminated for at least one (1) year . . .

(*Id.* § 13). And the non-disclosure clause is as follows:

> Employee's association with the Company under this Agreement has given and will give Employee access to Confidential Information (defined below) not generally known outside of the Company . . . . Employee will not at any time, except in performing the duties of Employee's employment . . . use, disclose, or publish any Confidential Information that Employee may learn . . . because of Employee's association with the Company, or use any such information in a manner that is or may reasonably be likely to be detrimental to the business of the Company.

(*Id.* § 14). The Employment Agreement defines the phrase "Confidential Information" broadly, as including FTI's "confidential and propriety information" and "any other information not generally known outside the Company that may be of value to the Company" but excluding "any information already properly in the public domain." (*Id.*).

The FTI Plaintiffs allege six counts regarding Defendant Secretariat's hiring of former FTI employees: (1) tortious interference with contract and business relations; (2) civil conspiracy; (3) inducing, aiding, and abetting the breach of the fiduciary duty and duty of loyalty; (4) misappropriation of trade secrets under the Defend Trade Secrets Act ("DTSA"), 18 U.S.C. § 1836 *et seq.*; (5) misappropriation of trade secrets under the Georgia Trade Secrets Act ("GTSA"), O.C.G.A. § 10-1-760 *et seq.*; and (6) unjust enrichment. Before the Court are two motions: FTI's Motion to Dismiss and its Motion for Certification

4

to the Supreme Court of Georgia.

## II.    Legal Standard

A complaint should be dismissed under Rule 12(b)(6) only where it appears that the facts alleged fail to state a "plausible" claim for relief. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); Fed. R. Civ. P. 12(b)(6). A complaint may survive a motion to dismiss for failure to state a claim, however, even if it is "improbable" that a plaintiff would be able to prove those facts; even if the possibility of recovery is extremely "remote and unlikely." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007). In ruling on a motion to dismiss, the court must accept the facts pleaded in the complaint as true and construe them in the light most favorable to the plaintiff. *See Quality Foods de Centro Am., S.A. v. Latin Am. Agribusiness Dev. Corp.*, 711 F.2d 989, 994–95 (11th Cir. 1983); *see also Sanjuan v. Am. Bd. of Psychiatry & Neurology, Inc.*, 40 F.3d 247, 251 (7th Cir. 1994) (noting that, at the pleading stage, the plaintiff "receives the benefit of imagination"). Generally, notice pleading is all that is required for a valid complaint. *See Lombard's, Inc. v. Prince Mfg., Inc.*, 753 F.2d 974, 975 (11th Cir. 1985). Under notice pleading, the plaintiff need only give the defendant fair notice of the plaintiff's claim and the grounds upon which it rests. *See Erickson v. Pardus*, 551 U.S. 89, 93 (2007) (citing *Twombly*, 550 U.S. at 555).

Federal courts may certify questions of law to the Georgia Supreme Court for an answer on "determinative" state law issues in the cases before them. O.C.G.A. § 15-2-9(a). Under Eleventh Circuit precedent, certification is appropriate when there is "substantial" or "significant" doubt regarding the status of state law. *People Gas Sys. v. Posen Constr., Inc.*, 931 F.3d 1337, 1340 (11th Cir. 2019); *Flo & Eddie, Inc. v. Sirius XM Radio, Inc.*, 827 F.3d 1016, 1025 (11th Cir. 2016). The decision to certify questions to a state supreme court is an exercise of judgment, restraint, and discretion that should be informed by several factors. *See Royal Cap. Dev., LLC v. Md. Cas. Co.*, 659 F.3d 1050, 1054–55 (11th Cir. 2011).

> The most important are the closeness of the question and the existence of sufficient sources of state law to allow a principled rather than conjectural conclusion. But also to be considered is the degree to which considerations of comity are relevant. And we must also take into account practical limitations of the certification process.

*Id.* at 1055 (quotation marks and alterations omitted).

## III.    Discussion

### A. Tortious Interference (Count I)

Georgia law provides for multiple forms of tortious interference claims, including tortious interference with contract and tortious interference with business relations. Secretariat is correct that FTI's Complaint combines both

in Count I.[3] Both forms require a similar showing. In Georgia, the necessary tortious interference elements are as follows:

> (1) improper action or wrongful conduct by the defendant without privilege; (2) the defendant acted purposely and with malice with the intent to injure; (3) the defendant induced a breach of contractual obligations [(i.e., tortious interference with contract)] or caused a party or third parties to discontinue . . . [a] business relationship with the plaintiff [(i.e., tortious interference with business relations)]; and (4) the defendant's tortious conduct proximately caused damage to the plaintiff.

*Tribeca Homes, LLC v. Marathon Inv. Corp.*, 322 Ga. App. 596, 598–99 (2013) (quoting *Duke Galish, LLC v. Manton*, 291 Ga. App. 827, 832 (2008)).

Secretariat seeks dismissal of FTI's tortious interference claim for at least three reasons: (1) binding Georgia precedent under *Parnell v. Sherman*, 364 Ga. App. 205, 214 (2022), forecloses relief; (2) the clauses in the relevant employment contracts are unenforceable in Georgia; (3) the Complaint does not adequately state a claim for relief. (Br. in Supp. of Def.'s Mot. to Dismiss, at 9–16 [Doc. 7-1]). The Court discusses each in turn.

### 1. Stranger Doctrine

The first element of a tortious interference claim is "improper action or wrongful conduct by the defendant without privilege." *Tribeca*, 322 Ga. App. at 598 (citation omitted). The "without privilege" requirement refers to the

---

[3] FTI styles Count I as a claim for "tortious interference with contract and prospective economic advantage." The Court construes this claim as a claim for tortious interference with contract and a claim for tortious interference with business relations.

stranger doctrine. Under the stranger doctrine, "a plaintiff must show that the alleged tortfeasor is a third party or a stranger to the contract or business relation at issue." *Healthy–IT, LLC v. Agrawal*, 343 Ga. App. 660, 670 (2017) (citations omitted).

Secretariat contends that *Parnell* requires this Court to find that Secretariat is not a "stranger" to any contract or business relationship here and that FTI thus cannot establish the first element of its tortious interference claim regarding the stranger doctrine. In *Parnell*, the Georgia Court of Appeals considered a case similar to the present one in which a plaintiff company sued a former employee and that employee's new employers for tortious interference. 364 Ga. App. at 205–06. The plaintiff alleged that the defendant employer hired a former employee in violation of his non-compete agreement, conspired with the employee to breach a non-competition agreement, breached a non-solicitation agreement and the aforementioned non-competition agreement, acted with malice to injure the plaintiff's business relationships, and caused the plaintiff to lose clients. *Id.* at 215. The *Parnell* court found that the defendant employer was not a "stranger" to the contract and business relationship because it "had a legitimate financial interest in [the defendant employee] potentially violating the agreement by inducing [the plaintiff company's] clients or potential clients to move their business from [the plaintiff company] to [the defendant company]. *Id.* at 216. Secretariat argues that, as

8

in *Parnell*, Secretariat has a "legitimate financial interest" in FTI's former employees violating their Employment Agreements by poaching FTI's clients and other employees. (*See* Br. in Supp. of Def.'s Mot. to Dismiss, at 10–13; Def.'s Resp. Br. in Opp'n to Pl.'s Mot. to Certify, at 11–12 [Doc. 22]).

Federal courts may decide not to follow a state intermediate court decision if there is "some persuasive indication that the state supreme court would decide otherwise." *Landcastle Acquisition Corp. v. Renasant Bank*, 465 F. Supp. 3d 1329, 1340 n.5 (N.D. Ga. 2020) (quotation marks and citations omitted), *rev'd on other grounds by* 57 F.4th 1203 (11th Cir. 2023); *see also Feminist Women's Health Ctr., Inc. v. Mohammad*, 586 F.2d 530, 552 (5th Cir. 1978) (regarding same). FTI argues that *Parnell* is an outlier and contrary to longstanding precedent in Georgia law, including as set out by the Georgia Supreme Court. The Court agrees and finds that there is a "persuasive indication that the [Georgia Supreme Court] would decide [*Parnell*] otherwise." *See Landcastle*, 465 F. Supp. 3d at 1340 n.5 (N.D. Ga. 2020) (citations omitted).

*Atlanta Market Center Management Co. v. McLane*, 269 Ga. 604 (1998), is the most recent Georgia Supreme Court precedent regarding the stranger doctrine. There, the Georgia Supreme Court "reiterate[d] that, in order to be liable for tortious interference, one must be a stranger to both the contract at issue and the business relationship giving rise to and underpinning the contract." *Id.* at 609. According to *McLane*, a "stranger" is someone who is a

"third party" to the contract or business relationship. *Id.* at 608. The *McLane* court reasoned that someone who is a party to a contract is clearly not a third party, but that does not necessarily mean that someone who is not a party to a contract is automatically a third party. *Id.* at 608. For example, an "intended third-party beneficiary of a contract, legally authorized to enforce the contract," is not a third party. *Id.* at 609. Furthermore, the *McLane* court recognized that even an "unintended" third-party beneficiary—someone who may not technically be a third-party beneficiary for contract law purposes but who regardless "benefit[s] from the contract"—may not be a third party.[4] *Id.* at 609. Other courts have used phrases such as a "legitimate and direct economic interest in the contract" (or similar) to express this idea of an unintended third-party beneficiary. *See, e.g.*, *Howerton v. Harbin Clinic, LLC*, 333 Ga. App. 191, 197 (2015); *Factory Direct Wholesale, LLC v. Office Kick, Inc.*, 2023 WL 2244694, at *5 (S.D. Ga. Feb. 27, 2023); *Lucasys Inc. v. PowerPlan, Inc.*, 576 F. Supp. 3d 1331, 1355 (N.D. Ga. 2021); *Mabra v. SF, Inc.*, 316 Ga. App. 62, 64 (2012); *Disaster Servs. v. ERC P'ship*, 228 Ga. App. 739,

---

[4] The parties additionally mention *McLane*'s finding that "all parties to a comprehensive interwoven set of contracts" are not third parties. *McLane*, 269 Ga. at 609. Although Secretariat bought out two FTI employees' non-compete and non-solicitation covenants, the Court does not consider there to be an interwoven contractual relationship between the parties concerning all alleged employees or all aspects of the Employment Agreements. (*See* Reply Br. in Supp. of Pl.'s Mot. to Certify, at 7 n.4 [Doc. 23]. *But see* Def.'s Resp. Br. in Opp'n to Pl.'s Mot. to Certify, at 11–12).

741 (1997).

*McLane* approvingly cited *Lake Tightsqueeze v. Chrysler First Financial Service Corp.*, 210 Ga. App. 178 (1993), and *Disaster Services v. ERC Partnership*, 228 Ga. App. 739 (1997), for the proposition that an unintended third-party beneficiary of this sort is a stranger. In *Lake Tightsqueeze*, the Georgia Court of Appeals held that an appellee creditor financing appellant debtors' residential lot development was not a stranger to contracts between the appellant debtors and buyers of those residential lots because the appellee creditor would have benefited from the appellant debtors' entering into those contracts. 210 Ga. App. at 181. In *Disaster Services*, a defendant company agreed to purchase the leasehold interest of a building but, shortly afterward, a fire damaged the property. 228 Ga. App. at 739. The original leaseholder entered into a contract with a company to repair the damage, but the leaseholder later canceled that contract upon subsequent negotiations by the buyer. *Id.* at 739–40. The *Disaster Services* court found that the buyer was not a stranger to the repair contract because it would have benefitted from the performance of the repair contract as a buyer of the leasehold interest. *Id.* at 740. In both *Lake Tightsqueeze* and *Disaster Services*, the unintended third-party beneficiary had an existing legitimate interest in the underlying contracts, prior to any alleged conduct of tortious interference. *Lake Tightsqueeze*, 210 Ga. App. at 181; *Disaster Servs.*, 228 Ga. App. at 741 ("[A]ll

actions by [defendant] were in the furtherance of a pre-existing contractual relationship with [plaintiff] and the completion of a pre-existing contract formation with [a building owner] to purchase realty . . ."); *see also Athens Int'l, Inc. v. Venture Cap. Props., Inc.*, 230 Ga. App 286, 288 (1998) ("A cause of action for intentional interference with contractual rights must be based on the intentional and non-privileged interference by a third party with existing contractual rights and relations." (citation omitted)).

In light of the above, the Court finds that *Parnell* substantially departs from *McLane*, *Lake Tightsqueeze*, *Disaster Services*, and other longstanding Georgia precedents. The *Parnell* court reasoned—in four relatively brief sentences—that the defendant competitor was not a stranger to the underlying employment agreement between the plaintiff and its employee because the defendant competitor "had a legitimate financial interest in [the employee] potentially violating the agreement by inducing" the plaintiff's clients to "move their business" to the defendant competitor. 364 Ga. App. at 403. In essence, and as FTI points out, *Parnell* appears to render a party not a stranger where it would "benefit [ ] from inducement of [a] contract's *breach*" rather than "*legitimately* benefit[ ] *from* a contract's *performance*," as Georgia courts seem to envision. (Reply Br. in Supp. of Pl.'s Mot. to Certify, at 9). *Parnell*'s interpretation would thus render moot all tortious interference claims as "presumably *the only reason* why a competitor would tortiously interfere with

a restrictive covenant would be to gain some financial interest or advantage from doing so." (*Id.* at 11 ("But that interest is never 'legitimate' without some relationship from which the defendant would benefit *from* the contract's *performance*, not just its breach.")). Finding a persuasive basis for believing the Georgia Supreme Court would not follow *Parnell*, the Court therefore declines to dismiss FTI's tortious interference claim on *Parnell* grounds. Accordingly, FTI's Motion for Certification is denied as moot.

### 2. Enforceability of Underlying Agreements

The Employment Agreements contain Maryland choice-of-law provisions, (Employment Agreement § 24), but Secretariat contends that the non-compete and non-solicitation clauses are invalid under Georgia law such that applying Maryland law would contravene Georgia public policy. (*See* Br. in Supp. of Def.'s Mot. to Dismiss, at 13 n.14). The Court will first outline Georgia law on non-compete agreements before turning to the law on non-solicitation agreements and finally the parties' arguments regarding each.

The Georgia Restrictive Covenants Act ("GRCA"), which went into effect in 2011, provides that restrictive covenants are enforceable "so long as such restrictions are reasonable in time, geographic area, and scope of prohibited activities." O.C.G.A. § 13-8-53(a). It also contains a blue-pencil provision, in which a court "may modify" a restrictive covenant that does not comply with O.C.G.A § 13-8-53. *Id.* § 13-8-54(b). With respect to the non-compete clause, the

13

parties appear to dispute only the geographic area requirement. A non-compete clause that "includes the areas in which the employer does business at any time during the parties' relationship . . . is [presumed] reasonable, provided that: (A) [t]he total distance encompassed by the provisions of the covenant also is reasonable; [or] (B) [t]he agreement contains a list of particular competitors as prohibited employers for a limited period of time . . ." *Id.* § 13-8-56(2). Moreover, "[t]he phrase 'the territory where the employee is working at the time of termination' or similar language shall be considered sufficient as a description of geographic areas if the person . . . bound by the restraint can reasonably determine the maximum reasonable scope of the restraint at the time of termination." *Id.* § 13-8-53(c)(2). In contrast, Georgia courts have held that a non-compete clause is "prima facie unreasonable" if it "fails to limit [an employee's] restricted activities either to the geographic area in which he served [the employer's] clients or to the geographic area in which [the employer] does business." *Carson v. Obor Holding Co.*, 318 Ga. App. 645, 652 (2012).

Regarding non-solicitation agreements, the GRCA renders enforceable non-solicitation agreements that require an employee to "refrain, for a stated period of time following termination, from soliciting . . . any business from any of such employer's customers . . . with whom the employee had material contact during his or her employment for purposes of providing products or

services that are competitive with those provided by the employer's business."
O.C.G.A. § 13-8-53(b). A non-solicitation agreement need not specify a
"geographic area or the types of products or services considered to be
competitive." *Id.* § 13-8-53(b). Moreover, any broadly worded prohibitions on
"'soliciting or attempting to solicit business from customers' or similar
language shall be adequate . . . and narrowly construed to apply only to:
(1) such of the employer's customers . . . with whom the employee had material
contact; and (2) products or services that are competitive with those provided
by the employer's business." *Id.* § 13-8-53(b).

  Secretariat contends that the non-compete and non-solicitation clauses
are unenforceable and thus cannot support a claim for tortious interference
with contract. Secretariat first contends that the non-compete clause is
unenforceable "because it contains a floating geographic restriction[ ] and
because such restriction includes any place where FTI's clients, to whom an
employee provided products or services, are located." (Br. in Supp. of Def.'s
Mot. to Dismiss, at 14 ("[T]he geographic restriction of the non-compete
restricts an employee from competing anywhere around the world if they once
provided services at a single location of an international client.")). According to
Secretariat, the Complaint does not include any allegations that would justify
the inclusion of a floating geographic restriction. (*Id.* at 14). Second, Secretariat
contends that the non-solicitation clause is unenforceable because (1) "it lacks

a geographic limitation," (2) "restrict[s] an employee from soliciting 'any person,' including individuals who are no longer providing services to FTI," and (3) "restrict[s] an employee from soliciting business" on matters on which the FTI employee worked rather than matters in which the employee had "material contact" with a client. (*Id.* at 14 & n.15).

At this stage of the litigation, the Court holds that both the non-compete and the non-solicitation clauses are enforceable under Georgia law. First, the Court disagrees with Secretariat regarding the reasonableness of the non-compete clause's geographic restriction. The non-compete clause prohibits former employees from working at a competing business within one year of their termination if the competing business is located where FTI "conducts any business" *and* (i) where the employee provided products, (ii) where the employee performed services, or (iii) "[FTI's] clients for which Employee provided products or services are located." (Employment Agreement § 17(c)). The Court does not read the clause as "restrict[ing] an employee from competing anywhere around the world" where one of the employee's clients is located, as Secretariat appears to contend, (Br. in Supp. of Def.'s Mot. to Dismiss, at 14), because the prohibited location also must be a location where FTI "conducts [ ] business" (i.e., presumably where it has an office or similar). (*See id.*). And, as explained above, geographic areas that include "areas in which the employer does business at any time during the parties' relationship"

16

are presumed "reasonable" if the "total distance encompassed by the provisions of the covenant also is reasonable." O.C.G.A § 13-8-56(2)(A). The Court finds the total distance reasonable in light of the allegations that FTI does business in a number of locations across the globe. *See Westrock Servs., LLC v. Roberts*, 2022 WL 1715964, at 5 (N.D. Ga. May 4, 2022) ("[W]hile the coverage area . . . covers large parts of the world, it is not a worldwide restriction . . ."). Furthermore, although the description of the geographic area is "generalized," the Court agrees with FTI that the non-compete clause nevertheless "provides fair notice of the maximum reasonable scope of the restraint [and thus] satisf[ies] [the geographic area] requirement." O.C.G.A § 13-8-53(c)(1). FTI need not provide a document listing specific locations in order for the Court to find fair notice. (*Contra* Reply Br. in Supp. of Def.'s Mot. to Dismiss, at 10 n.11 [Doc. 21]).

Second, the non-solicitation clause does not appear to run afoul of Georgia law. To support its argument that a non-solicitation clause requires a geographic limitation, Secretariat relies on a 2023 decision by the Georgia Court of Appeals, *North American Senior Benefits, LLC v. Wimmer*, 368 Ga. App. 124, 129–30 (2023). (Br. in Supp. of Def.'s Mot. to Dismiss, at 14). However, in the period since briefing the Motion to Dismiss, the Georgia Supreme Court reversed that lower court decision and held that a restrictive covenant need not contain an express geographic limitation. *N. Am. Senior*

*Benefits, LLC v. Wimmer*, 319 Ga. 641, 648 (2024). Rather, a court can find that the "geographic scope is reasonable in light of the totality of the circumstances." *Id.* Beyond the fact that the non-solicitation clause lacks an express geographic scope, Secretariat makes no argument as to why the non-solicitation clause is unreasonable in geographic scope. And, in light of the totality of the circumstances—including allegations of the international nature of FTI's business and the time limitations already in place[5]—the Court does not find the geographic scope unreasonable at this time. Secretariat separately argues that the clause is unenforceable because it defines "any person" as including those "no longer providing services to FTI." (Br. in Supp. of Def.'s Mot. to Dismiss, at 14 n.15). The Court disagrees. The non-solicitation clause prohibits soliciting business from "any person or entity *who is a client*" or "any person *who the Company employees or otherwise engages to perform services*," implying that the prohibition applies to those who are clients and employees at the time of the solicitation. (Employment Agreement § 13). Lastly, the GRCA provides that non-solicitation clauses may be enforceable even if they do not contain specific language regarding who qualifies as a client (i.e., an employer's customers with whom an employee had "material contact" while employed). Specifically, O.C.G.A. § 13-8-53(b) instructs courts to find broad

---

[5] The non-solicitation clause prohibits solicitation described for the period between the effective date of the employment contract and twelve months from the employee's termination. (Employment Agreement § 17(a)).

prohibitions on "soliciting or attempting to solicit business from customers" sufficient and to "narrowly construe[ ]" such provisions to apply to clients "with whom the employee had material contact." This language is sufficient to defeat Secretariat's arguments that the non-solicitation clause lacks specificity regarding "material contact."

Given the above, the Court holds that the non-compete and non-solicitation clauses do not contravene Georgia public policy. Accordingly, the Maryland choice-of-law provision applies. *See Motorsports of Conyers, LLC v. Burbach*, 317 Ga. 206, 210 (2023) ("[C]ontractual choice-of-law provisions 'will be enforced unless application of the chosen law would be contrary to the public policy or prejudicial to the interest of this state.'"). Secretariat does not provide—and the Court is not aware of—any reason why the non-compete and non-solicitation clauses are invalid under Maryland law. (*See* Pl.'s Resp. Br. in Opp'n to Def.'s Mot. to Dismiss, at 17 n.16 [Doc. 15] (collecting cases on Maryland law)). The Court thus declines at this time to dismiss the tortious interference with contract claim due to lack of enforceability.

### 3.  Failure to Adequately Plead

For a tortious interference claim, a plaintiff must show that "the defendant's tortious conduct proximately caused damage to the plaintiff." *Tribeca*, 322 Ga. App. at 598–99 (citation omitted). Secretariat argues that FTI has failed to sufficiently allege such an injury for its tortious interference with

business relations claim. (Reply Br. in Supp. of Def.'s Mot. to Dismiss, at 7). Specifically, it argues that "FTI does not allege that it has lost any business and fails to allege a *single* customer or perspective customer that has ended or refused to enter into a business relationship with FTI due to Secretariat's alleged conduct." (*Id.* at 8). Instead, according to Secretariat, FTI "mere[ly] speculat[es]" about "potential loss of business." (Br. in Supp. of Def.'s Mot. to Dismiss, at 16 (quoting Compl. ¶ 51)).

FTI appears to defend its Complaint by explaining that it has sufficiently alleged the induced breach of employees' Employment Agreements and that "[t]hese allegations alone suffice to state its claim for tortious interference." (Pl.'s Resp. Br. in Opp'n to Def.'s Mot. to Dismiss, at 13). It further asserts that it "alleges that it has been harmed by Secretariat's conduct." (*Id.* (citing Compl. ¶¶ 67, 70)).

While the Court agrees that the tortious interference claim should not be dismissed altogether because FTI plausibly pleads specific facts as to all elements of a tortious interference with contract claim, the Court agrees with Secretariat that FTI fails to plausibly plead all elements of a tortious interference with business relations claim. To the extent FTI alleges a tortious interference with business relations claim, that claim is thus dismissed. The most descriptive allegations of injury that the Court can find in FTI's Complaint are contained in ¶ 70, where it states:

> FTI has suffered injury and damages as a direct and proximate result of the challenged conduct, including but not limited to actual damages, lost profits, mitigation expenses, loss of value and goodwill of FTI's impacted practice groups commensurate at least with the forecast revenues from customers and employees who were the targets of the interference alleged.

(Compl. ¶ 70). With respect to a loss of existing or future business relations, these general allegations are not sufficient to survive a motion to dismiss. *See Diamond Power Int'l, Inc. v. Davidson*, 540 F. Supp. 2d 1322, 1347 & n.19 (noting that the court "would be inclined" to dismiss the tortious interference claim because the plaintiff could not "point to a single individual that was induced not to enter into or continue a business relationship"). While the Court does not hold that FTI must list specific existing or prospective clients that were lost—it need not—FTI must offer at least some factual, nonconclusory allegations regarding the loss of existing or prospective clients. The loss of "potential" business is not enough. The Court therefore dismisses Count I to the extent it pleads a tortious interference with business relations claim.

### B. Civil Conspiracy (Count II)

In Georgia, a civil conspiracy is "a combination between two or more persons either to do some act which is a tort, or else to do some lawful act by methods which constitute a tort." *Metro Atlanta Task Force for the Homeless, Inc. v. Ichthus Cmty. Tr.*, 298 Ga. 221, 225 (2015) (quoting *Cook v. Robinson*, 216 Ga. 328, 328–29 (1960)). Any claim for conspiracy must have an underlying tort since the "conspiracy itself furnishes no cause of action." *Id.* (quoting *Cook*,

21

298 Ga. at 225). The Georgia Supreme Court has stated that "[t]he essential element of a civil conspiracy is a common design." *Id.* (citing *Outside Carpets, Inc. v. Indus. Rug Co.*, 228 Ga. 263, 269 (1971)). FTI alleges that Secretariat conspired with private equity backers and former FTI employees to "injure FTI" by (1) "raiding and misappropriating FTI professionals" with non-compete, non-solicitation, and/or non-disclosure obligations, (2) "interfering with FTI's contractual and prospective client and business relationships," (3) "imposing conflicts of interest upon current and former FTI professionals," and (4) "misappropriating FTI's confidential information." (Compl. ¶ 75). Secretariat asserts that these and other conspiracy allegations "are no more than bare legal conclusions masqueraded as facts." (Br. in Supp. of Def.'s Mot. to Dismiss, at 18; *see also* Reply Br. in Supp. of Def.'s Mot. to Dismiss, at 14 ("FTI does not detail 'how' or when the[ ] employees took direction from Secretariat . . . , and the mere fact that the[ ] employees began working at Secretariat 'is not enough to allege a conspiracy.'")).

The Court holds that dismissal of Count III is inappropriate at the time. The allegations in the Complaint plausibly suggest that there was some sort of coordinated scheme between Secretariat and the former FTI employees. The Complaint alleges that Secretariat directed the employees to take certain actions (e.g., not providing notices of termination, not "respond[ing] to or deal[ing] with FTI" regarding alleged contract breaches, no longer working

"full-time" on FTI business, and other actions regarding "FTI client and personnel matters"). (Compl. ¶¶ 66, 83). And it contains multiple other allegations regarding actions taken by the employees to the benefit of Secretariat that would plausibly not occur absent some coordination with Secretariat (e.g., "soliciting FTI clients to stop doing business with FTI both before and after they depart FTI's employ," soliciting other FTI employees to join Secretariat). (*Id.* ¶¶ 42–51). The Complaint's allegations are not merely labels and conclusions, and they speak to how Secretariat allegedly conspired with former FTI employees to, among other things, tortiously interfere with the Employment Agreements. (*Contra* Br. in Supp. of Def.'s Mot. to Dismiss, at 18 ("FTI fails to allege . . . *how* Secretariat supposedly conspired with the Named Employees to do so.")).

Moreover, the Court agrees with FTI that the two cases to which Secretariat points are distinguishable. In *Agilysys, Inc. v. Hall,* another court within this district dismissed a civil conspiracy claim because the plaintiff pleaded in conclusory terms that the defendants "conspired and made a plan" and had "[n]o underlying torts remain[ing]" in the case. 258 F. Supp. 3d 1331, 1355 (N.D. Ga. 2017). Similarly, in *Automotive Assurance Group v. Giddens*, the court found insufficient the plaintiff's allegations that the defendants "conspired" with each other "by concerted action" and "unlawful means." 2020 WL 10056277, at *9–10 (N.D. Ga. Dec. 16, 2020) (citing *Agilysys*, 258 F. Supp.

3d at 1355). The facts alleged in the present Complaint sufficiently go beyond those in *Agilysys* and *Giddens*. The Court therefore concludes that the Complaint states a plausible conspiracy claim. *See Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 570).

## C. Inducing, Aiding, and Abetting Breach of Fiduciary Duty and Duty of Loyalty (Count III)

A claim for aiding and abetting such breach requires a plaintiff to plead that the defendant gave "advice, counsel, persuasion, or comment . . . in procuring any person to commit an actionable wrong." *Angel Oak Mortg. Sols. LLC v. Mastronardi*, 593 F. Supp. 3d 1234, 1243 (N.D. Ga. 2022) (citation omitted). In its Complaint, FTI alleges that Secretariat aided and abetted FTI's former employees in breaching their fiduciary duty and duty of loyalty, including their "duty to act in FTI's best interest, not divert corporate opportunities from FTI, and not take any other actions on matters for which any of them had a conflict of interest with FTI." (Compl. ¶ 82). FTI alleges that Secretariat "direct[ed]" former FTI employees regarding "FTI client and personnel matters while still employed at FTI" and "direct[ed]" them to "not [ ] deal with FTI on client or personnel matters while still employed at FTI." (*Id.* ¶ 83). FTI also alleges that Secretariat "advis[ed]" former FTI employees, prior to or after hiring, that their FTI employment contract restrictive covenants were not enforceable." (*Id.*). According to the Complaint, Secretariat "knew" that FTI's employees were acting in ways that breached their fiduciary duty

and duty of loyalty.

Secretariat argues that the Complaint does not plausibly plead this aiding and abetting claim. It points to reasons such as failure to describe "actual communication, representation or other conduct," "when or in what way or manner the Named Employees took 'direction from Secretariat,'" or "why" the employees may have held themselves out as Secretariat employees. (Br. in Supp. of Def.'s Mot. to Dismiss, at 24–25). The Court disagrees with Secretariat that these kinds of details are necessary at this stage of the litigation. For purposes of the Motion to Dismiss, FTI sufficiently pleads its aiding and abetting claim. The Complaint includes specific references to "direction" and "advi[ce]" by Secretariat that could have plausibly induced the FTI employees to breach their fiduciary duty and duty of loyalty. Secretariat's Motion to Dismiss Count III is denied.

### D. Trade Secrete Misappropriation (Counts IV and V)

#### 1. Failure to Adequately Plead

Secretariat seeks to dismiss Counts IV and V of the Complaint, which allege the misappropriation of trade secrets under the Defend Trade Secrets Act and the Georgia Trade Secrets Act, respectively. The DTSA defines "trade secret" as

> all forms and types of financial, business, scientific, technical, economic, or engineering information . . . if (A) the owner thereof has taken reasonable measures to keep such information secret; and (B) the information derives independent economic value,

25

actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information.

18 U.S.C. § 1839(3). The DTSA defines "misappropriation" as including (a) the "*acquisition* of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means" or (b) the "*disclosure or use* of a trade secret of another without . . . consent by a person who (i) used improper means to acquire knowledge of the trade secret [or] (ii) at the time of disclosure or use, knew or had reason to know that the knowledge of the trade secret was" improperly acquired. *Id.* § 1839(5) (emphasis added). The DTSA defines "improper means" as including "theft, bribery, misrepresentation, breach or inducement of a breach of a duty to maintain secrecy, or espionage through electronic or other means." *Id.* § 1839(6)(A). For our purposes, the language of the DTSA is nearly identical to that of the GTSA.[6] The Court will thus treat the two statutes as one.

Secretariat argues that FTI failed to adequately plead the existence of a trade secret and any misappropriation. First, the Court concludes that FTI adequately pleads the existence of a trade secret under the DTSA and GTSA.

---

[6] *Compare* 18 U.S.C. § 1839(5) (defining "misappropriation"), *and id.* § 1839(6) (defining "improper means"), *and id.* § 1839(d) (defining "trade secret"), *with* O.C.G.A. § 10-1-761(2) (defining "misappropriation"), *and id.* § 10-1-761(1) (defining "improper means"), and *id.* § 10-1-761(4) (defining "trade secret").

In its Complaint, FTI alleges that FTI acquired the following information: "FTI customer lists, personnel information including performance evaluations, compensation levels, and other confidential information bearing on the relative skills and merits of FTI professionals in various practice groups, financial information, marketing information, and other confidential strategic business information constituting FTI trade secrets." (Compl. ¶ 95; *see also id.* ¶ 107 (making substantially similar claims)). Secretariat contends that FTI failed to allege that (1) it took steps to protect the above information, (2) such information derives "independent economic value from not being generally known," and (3) relatedly, such information "could not have been derived from public sources" or shared under laws that allow employees to share compensation information. (Br. in Supp. of Def.'s Mot. to Dismiss, at 21). The Court disagrees. FTI adequately pleads that it took steps to protect its confidential information by restricting access to the information and requiring employees with access to agree in writing not to disclose or use the information in an unauthorized manner. (Compl. ¶¶ 92, 104 (referring to "need-to-know" restrictions, password protections, and encrypted databases, among other things)). The information described—which includes FTI's client lists and personnel information such as performance evaluations and compensation— plausibly meets the "independent economic value" standard. (*See* Pl.'s Resp. Br. in Opp'n to Def.'s Mot. to Dismiss, at 20 & n.18 (collecting cases)). The fact that

27

some of the information—such as employee compensation—may have been shared lawfully or obtained from public sources does not deny the existence of a trade secret, especially where the alleged information includes other information—such as FTI's client lists—that plausibly would not be "generally known." *See* 18 U.S.C. § 1839(3). Therefore, the Court agrees with FTI that it sufficiently pleads the existence of a trade secret.

Second, the Court concludes that FTI plausibly pleads misappropriation under the DTSA and GTSA. Secretariat contends that FTI failed to allege Secretariat (1) "knew or should have known that the Named Employees allegedly acquired FTI's alleged trade secrets by improper means" or (2) used or disclosed the alleged trade secrets. (*See* Br. in Supp. of Def.'s Mot. to Dismiss, at 19–20). But FTI plausibly alleges each. FTI alleges that the employees at issue signed agreements to, among other things, not use, disclose, or publish confidential information obtained during their employment. (Compl. ¶ 27). And FTI plausibly alleges that Secretariat knew about these agreements because FTI states it sent a number of cease-and-desist letters to Secretariat, (*Id.* ¶¶ 43, 52), and negotiated with Secretariat buyouts of at least two employees' non-compete and client non-solicitation covenants with Secretariat, (*Id.* ¶ 48). Moreover, FTI plausibly alleges that Secretariat relied on confidential information—such as employee compensation levels and performance metrics—in its efforts to hire FTI's employees. For example, FTI

28

alleges that, "immediately" after Secretariat hired former FTI senior managing directors Carrie Distler and Gary Kleinrichert, Secretariat sent "firm offers of employment" to Distler's and Kleinrichert's former teams at "at compensation levels higher than they received at FTI" and "[w]ithout any prior interviews or dialogue whatsoever with these additional FTI professionals." (*Id.* ¶ 49). The Court agrees that these alleged "cold-call" offers plausibly show that Secretariat used "inside knowledge about FTI trade secret and confidential personnel matters, including compensation and performance metrics" that "Secretariat could not have derived . . . from any public source." (*Id.* ¶ 49).

### 2.  Preemption by the Georgia Trade Secrets Act

The Georgia Trade Secrets Act "supersede[s] conflicting tort, restitutionary, and other laws of this state providing civil remedies for misappropriation of a trade secret," O.C.G.A. § 10-1-767(a), but it does not supersede "[c]ontractual duties or remedies, whether or not based upon misappropriation of a trade secret" or "[o]ther civil remedies that are not based upon misappropriation of a trade secret." *Id.* § 10-1-767(b)(1)–(2). The Georgia Supreme Court has stated that the GTSA "preempts claims [that] rely on the same allegations as those underlying the plaintiff's claim for misappropriation of a trade secret." *Robbins v. Supermarket Equip. Sales, LLC*, 290 Ga. 462, 466 (2012) (alteration in original) (quoting *ProNvest, Inc. v. Levy*, 307 Ga. App. 450, 451 (2010)). A court must ask "whether the same factual allegations of

29

misappropriation are being used to obtain relief outside the GTSA," whether or not an alleged trade secret is "ultimately found to be [a] trade secret[ ]." *Id.* at 466–67. This analysis seeks to prevent a plaintiff from pleading a "lesser and alternate theory of restitution simply because the information [allegedly misappropriated] does not qualify as a trade secret." *Id.* at 465.

Secretariat argues that Counts I–III and VI "are all premised on the same alleged conduct and injury that are necessary to prove [FTI's] trade secret misappropriation claims." (Br. in Supp. of Def.'s Mot. to Dismiss, at 22). As a result, Secretariat asks the Court to dismiss these claims "to the full extent that they are premised upon misappropriation" and thus preempted by the GTSA. (Br. in Supp. of Def.'s Mot. to Dismiss, at 23; Reply Br. in Supp. of Def.'s Mot. to Dismiss, at 14).

The Court finds that the allegations in Counts I–III and VI extend beyond merely trade secret misappropriation, so altogether dismissal of those claims on preemption grounds is not appropriate at this time. *See, e.g.*, *Interra Int'l, LLC v. Al Khafa*ji, 2017 WL 4866266, at *6 (N.D. Ga. Mar. 21, 2017) (declining to preempt a tortious interference claim because it "[went] beyond alleging a misappropriation . . . and contend[ed] that Defendants unlawfully interfered with a preexisting contract and business relationship). For example, Counts I and II rely on allegations that Secretariat tortiously interfered with former employees' non-compete and non-solicitation provisions and conspired

30

with those employees to breach those agreements. (Compl. ¶¶ 61–66, 75–77; *see also* Pl.'s Supp. Br. in Opp'n to Def.'s Mot. to Dismiss, at 2–3 [Doc. 20] (explaining the same)). Similarly, Count III alleges that Secretariat aided and abetted former FTI employees in breaching their fiduciary duty and duty of loyalty through several means that would appear independent of any alleged acquisition or use of trade secrets. These include allegations that Secretariat supposedly knew the employees "[held] themselves out as Secretariat employees while still employed at FTI," knew the employees "engag[ed] in marketing activities on behalf of Secretariat while still employed at FTI," and "direct[ed]" the employees on FTI client and personnel matters while still employed at FTI." (Compl. ¶ 83). Lastly, Count VI alleges that Secretariat was unjustly enriched through, among other things, "its hiring [ ] of the solicited directors" despite these directors' having signed restrictive covenants that Secretariat may have otherwise needed to buy out. (*Id.* ¶ 114). Allegations of this sort are unrelated to trade secret misappropriation.

That being said, Secretariat appears correct that, to the extent FTI seeks relief in Counts I–III and VI premised on allegations of trade secret misappropriation, the GTSA preempts that relief. (*See* Reply Br. in Supp. of Def.'s Mot. to Dismiss, at 14 ("[T]he GTSA preempts FTI's claims to the full extent that they are based upon alleged misappropriation of trade secrets." (citing *Angel Oak*, 593 F. Supp. 3d at 1241); *see also id.* at 13 (citing *NCR Corp.*

*v. Pendum*, 2018 WL 11343391, at *12 (N.D. Ga. Aug. 8, 2018))). FTI may not do so as a result.

## IV.    Conclusion

For the foregoing reasons, Defendant Secretariat Advisors, LLC's Motion to Dismiss [Doc. 7] is GRANTED in part and DENIED in part. The Court dismisses Count I with respect to the tortious interference with business relations claim. To the extent that Counts I through III and VI are premised upon allegations of trade secret misappropriations, they are also dismissed. The Motion to Dismiss is denied as to all other relief requested therein. Additionally, Plaintiffs FTI Consulting, Inc. and FTI, LLC's Motion for Certification to the Supreme Court of Georgia [Doc. 17] is DENIED as moot.

SO ORDERED, this ____7th____ day of March, 2025.


THOMAS W. THRASH, JR.
United States District Judge

32